**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DONALD ABUDA, JOHN ADAMIC, EILEEN ADVINCULA, CHUKWUEMEKA AGIRI, CHRISTOPHER AGUERO, JONATHAN AIKMAN, ROMANO ALLAN, ALLEN FAMILY MANAGEMENT LLC, GEOFFREY ALLEYNE, DALEY ANTOINE, MATY AVIDAN, JASON BAGLEY, DOMINGO BALINTON, STEVE BAMBERGER, ELIJAH BARLOW, CHRISTOPHER BARNABY, JOSEPH BARRERAS, JASON BEAL, JAMES BEAM, MARK BEKEMEIER, BRYAN BELINSKY, GABRIEL BALU BHORE, LOUIE BIDZOVSKI, PATRICK BLAKELY, BRADLEY BRANDERHORST, DAVID BRIDGES, JOHN BROWN, KYLE BURGERS, RONALD BUSH, CRAIG BUSKE, SHAI BUTBUL, GLEN CAMERON, ZAC CAMPBELL, MARK CANAVAN, DENIS CAPELNIK, WILLIAM CARGILL, CAROLYNE CASS, ARMANDO CASTILLO PUEBLA, KWOK CHAN, JOSHUA CHASE, CURTIS CHOE, SHAWN CHOI, BILL COBEY, MANUEL CORDOVA, MICHAEL CRAIG, CHARLIE CREWS, ADAM CROMWELL, RAUL CRUZ, STEPHANE DABADIE, ANDRA DALTO, CAROLYN DAVIS, PATRICK DAVIS, SAMY DAWOOD, DEREK DAY, PATRICK DEFEO, JAKE DEROSAS, SANDER DE WAAL, DANIEL DEYOUNG, HOMER DIAZ, PATRICK DUNN, SAMAN EBRAHIMI, ECET INC., BENJAMIN EDWARDS, JOSHUA ELLIS, EVERGREEN DISTRIBUTORS, ARTHUR FANDUNYAN, DAN FARACI, LINA FERLAZZO, MATTHEW FERRARO, JIM FOIL, CIARAN FORSYTHE, JURMAN FRANKEL, MICHAEL FRASINELLI,

**Case No.: 1:22-cv-10869**

**JURY TRIAL DEMANDED**

1

LIDA GALKA, RICHARDO GAYTAN, BENNETT GENTILE, MICHAEL GETER, PAUL GIACOBBE, MARK GILL, BEN GILLMORE, ROBERT GLEN, GLOBAL PERSPECTIVE LIMITED, JOSHUA GLOBKE, RAJU GOKUMATTELLA, SHANE GORMAN, GARY GOULD, GREENTECH HOLDINGS, LTD., MICHAEL GUEDES, JR., HATIM HAMAD, MATTHEW HARBER, DANIEL HARGROVE, DAVID HARGROVE, DAVID HARRIS, DAN HITTENMARK, BRIAN HOURIHAN, TRACY HOWELL, SEAN HURST, MUSA IMOEDE, MICHEL ISMANOVSKI, MARQUITA JEFFRESS, JOSHUA JOHNSON, BOBBY JONES, RICHARD JONES, JOSHUA KAMIS, GEORGII KARMAZIN, SHABAB KHALID, MAX KHAZANOV, GARY KING, KRIS KIRKHAM, WILLIAM KISSEE, JR., JOSHUA LANDVREUGD, BRIAN LAPIERRE, TRAVIS LAZZARO, BRENNAN LELEUX, MICHAEL LEVI, DOUGLAS LEVIN, BRIAN LI, DEBORAH LILES, DAVID LITTLECHILD, VICTOR LOVELL, CANGABAI LUO, CAMERON MANN, JEFFREY MARKLEY, CHRISTOPHER MARTIN, MICHAEL MATIONSCHEK, ANDY MCCAULEY, CALVIN MCCORMICK, OWEN MCCORMICK, JERMILA MCCOY, MARC MCKINNON, JESSE MEDINA, JOSE MELO FERNANDEZ, RICARDO MERA, JONATHAN MERWIN, DENNIS MILENKOVIC, NICHOLAS W. MILLER, MOHAMMAD TAOB MUHAMAD HUSAIN, CARLES MUINOS, EDUARDO MUNIZ, DUONG NGUYEN, DUONG NGUYEN, MY LINH NGUYEN, TUAN NGUYEN, JESSE NICKEL, LAURA NIEUWENHUIS, MARI-NOEL NSANA, TYLER OLSON, DURIYE OSMAN, ERIC OWEN, SARFARAZ PAKAL, LEVY SERGIO PALACIOS, DOUG PEAKER, BRENT PENA, JOSH PENTLAND,

RICARDO PETERS, RYAN PULLEY,
FARSHID RAMESHNI, DEREK REAY,
GREGORY REID, KATHLEEN REVIVO,
HEATHER ROBINSON, JOHNNY
RONCA, LEONARD ROSS, MICHAEL
RYAN, JEREMY SCHWAB, ADIL
SERMOUH, NATE SHIELDS, ISAAC
SHUEKE, MARK SNOWDON, MICHEL
SOLOUNIAS, RONY SOOD, ALVIN
STEVENS, PHILL STEVENS,
ALEXANDER STEVENSON, DAVID
STRAUSS, RATEB SULEIMAN,
MARTIJN TIDEMAN, KEVIN TOQE,
CHRISTOPHER TROIANO, JOEL
VERDICO, VAN VILCHEZ, ELMAR
VON GROLMAN, ALAIN VOOGT,
SIMON WEHREN, RYAN
WERMERSKIRCHEN, DAVID JASON
WEST, WEX CAPITAL LLC, BRANDON
WHITE, JOSHUA WHITNEY, HANNAH
WILKES, WADE WILSON, ASHA WOO,
RODERICK WRIGHT, JAIME YBARRA,
ALI HAN YENISEHIRLIOGLU, STEVE
YOUNG, RON ZABEL, and ZEIN
ZAIOUD,

    *Plaintiffs*,

vs.

STRONGBLOCK, DAVID MOSS, BRIAN
ABRAMSON, COREY LEDERER,
KONSTANTIN SHKUT, AND JOHN DOE
DEFENDANTS 1-5,

    *Defendants*.

_____/

## **COMPLAINT**

Plaintiffs, DONALD ABUDA ("Abuda"), JOHN ADAMIC ("Adamic"), EILEEN

ADVINCULA ("Advincula"), CHUKWUEMEKA AGIRI ("Agiri"), CHRISTOPHER

AGUERO ("Aguero"), JONATHAN AIKMAN ("Aikman"), ROMANO ALLAN

("Allan"), ALLEN FAMILY MANAGEMENT LLC ("AFM"), GEOFFREY ALLEYNE ("Alleyne"), DALEY ANTOINE ("Antoine"), MATY AVIDAN ("Avidan"), JASON BAGLEY ("Bagley"), DOMINGO BALINTON ("Balinton"), STEVE BAMBERGER ("Bamberger"), ELIJAH BARLOW ("Barlow"), CHRISTOPHER BARNABY ("Barnaby"), JOSEPH BARRERAS ("Barreras"), JASON BEAL ("Beal"), JAMES BEAM ("Beam"), MARK BEKEMEIER ("Bekemeier"), BRYAN BELINSKY ("Belinsky"), GABRIEL BALU BHORE ("Bhore"), LOUIE BIDZOVSKI ("Bidzovski"), PATRICK BLAKELY ("Blakely"), BRADLEY BRANDERHORST ("Branderhorst"),   DAVID BRIDGES ("Bridges"), JOHN BROWN ("Brown"), KYLE BURGERS ("Burgers"), RONALD BUSH ("Bush"), CRAIG BUSKE ("Buske"), SHAI BUTBUL ("Butbul"), GLEN CAMERON ("Cameron"), ZAC CAMPBELL ("Campbell"), MARK CANAVAN ("Canavan"), DENIS CAPELNIK ("Capelnik"), WILLIAM CARGILL ("Cargill"), CAROLYNE CASS ("Cass"), ARMANDO CASTILLO PUEBLA ("Castillo Puebla"), KWOK CHAN ("Chan"), JOSHUA CHASE ("Chase"), CURTIS CHOE ("Choe"), SHAWN CHOI ("Choi"), BILL COBEY ("Cobey"), MANUEL CORDOVA ("Cordova"), MICHAEL CRAIG ("Craig"), CHARLIE CREWS ("Crews"), ADAM CROMWELL ("Cromwell"), RAUL CRUZ ("Cruz"), STEPHANE DABADIE ("Dabadie"), ANDRA DALTO ("Dalto"), CAROLYN DAVIS ("C. Davis"), PATRICK DAVIS ("P. Davis"), SAMY DAWOOD ("Dawood"), DEREK DAY ("Day"), SANDER DE WAAL ("de Waal"), PATRICK DEFEO ("DeFeo"), JAKE DEROSAS ("Derosas"), DANIEL DEYOUNG ("DeYoung"), HOMER DIAZ ("Diaz"), PATRICK DUNN ("Dunn"), SAMAN EBRAHIMI ("Ebrahimi"), ECET INC. ("ECET"), BENJAMIN EDWARDS ("Edwards"), JOSHUA ELLIS ("Ellis"), EVERGREEN DISTRIBUTORS ("Evergreen"),

ARTHUR FANDUNYAN ("Fandunyan"), DAN FARACI ("Faraci"), LINA FERLAZZO ("Ferlazzo"), MATTHEW FERRARO ("Ferraro"), JIM FOIL ("Foil"), CIARAN FORSYTHE ("Forsythe"), JURMAN FRANKEL ("Frankel"), MICHAEL FRASINELLI ("Frasinelli"), LIDA GALKA ("Galka"), RICARDO GAYTAN ("Gaytan"), BENNETT GENTILE ("Gentile"), MICHAEL GETER ("Geter"), PAUL GIACOBBE ("Giacobbe"), MARK GILL ("Gill"), BEN GILLMORE ("Gillmore"), ROBERT GLEN ("Glen"), GLOBAL PERSPECTIVE LIMITED ("GPL"), JOSHUA GLOBKE ("Globke"), RAJU GOKUMATTELLA ("Gokumattella"), SHANE GORMAN ("Gorman"), GARY GOULD ("Gould"), GREENTECH HOLDINGS, LTD. ("Greentech Holdings"), MICHAEL GUEDES, JR. ("Guedes"), HATIM HAMAD ("Hamad"), MATTHEW HARBER ("Harber"), DANIEL HARGROVE ("Daniel Hargrove"), DAVID HARGROVE ("David Hargrove"), DAVID HARRIS ("Harris"), DAN HITTENMARK ("Hittenmark"), BRIAN HOURIHAN ("Hourihan"), TRACY HOWELL ("Howell"), SEAN HURST ("Hurst"), MUSA IMOEDE ("Imoede"), MICHEL ISMANOVSKI ("Ismanovski"), MARQUITA JEFFRESS ("Jeffress"), JOSHUA JOHNSON ("Johnson"), BOBBY JONES ("B. Jones"), RICHARD JONES ("R. Jones"), JOSHUA KAMIS ("Kamis"), GEORGII KARMAZIN ("Karmazin"), SHABAB KHALID ("Khalid"), MAX KHAZANOV ("Khazanov"), GARY KING ("King"), KRIS KIRKHAM ("Kirkham"), WILLIAM KISSEE, JR. ("Kissee"), JOSHUA LANDVREUGD ("Landvreugd"), BRIAN LAPIERRE ("LaPierre"), TRAVIS LAZZARO ("Lazzaro"), BRENNAN LELEUX ("Leleux"), MICHAEL LEVI ("Levi"), DOUGLAS LEVIN ("Levin"), BRIAN LI ("Li"), DEBORAH LILES ("Liles"), DAVID LITTLECHILD ("Littlechild"), VICTOR LOVELL ("Lovell"), CANGABAI LUO ("Luo"), CAMERON MANN ("Mann"), JEFFREY MARKLEY ("Markley"), CHRISTOPHER

MARTIN ("Martin"), MICHAEL MATIONSCHEK ("Mationschek"), ANDY MCCAULEY ("McCauley"), CALVIN MCCORMICK (C. McCormick), OWEN MCCORMICK ("O. McCormick"), JERMILA MCCOY ("McCoy"), MARC MCKINNON ("McKinnon"), JESSE MEDINA ("Medina"), JOSE MELO FERNANDEZ ("Melo Fernandez"), RICARDO MERA ("Mera"), JONATHAN MERWIN ("Merwin"), DENNIS MILENKOVIC ("Milenkovic"), NICHOLAS W. MILLER ("Miller"), MOHAMMAD TAOB MUHAMAD HUSAIN ("Muhamad Husain"), CARLES MUINOS ("Muinos"), EDUARDO MUNIZ ("Muniz"), DUONG NGUYEN ("Nguyen 1"), DUONG NGUYEN ("Nguyen 2"), MY LINH NGUYEN ("M.L. Nguyen"), TUAN NGUYEN ("T. Nguyen"), JESSE NICKEL ("Nickel"), LAURA NIEUWENHUIS ("Nieuwenhuis"), MARI-NOEL NSANA ("Nsana"), TYLER OLSON ("Olson"), DURIYE OSMAN ("Osman"), ERIC OWEN ("Owen"), SARFARAZ PAKAL ("Pakal"), LEVY SERGIO PALACIOS ("Palacios"), DOUG PEAKER ("Peaker"), BRENT PENA ("Pena"), JOSH PENTLAND ("Pentland"), RICARDO PETERS ("Peters"), RYAN PULLEY ("Pulley"), FARSHID RAMESHNI ("Rameshni"), DEREK REAY ("Reay"), GREGORY REID ("Reid"), KATHLEEN REVIVO ("Revivo"), HEATHER ROBINSON ("Robinson"), JOHNNY RONCA ("Ronca"), LEONARD ROSS ("Ross"), MICHAEL RYAN ("Ryan"), JEREMY SCHWAB ("Schwab"), ADIL SERMOUH ("Sermouh"), NATE SHIELDS ("Shields"), ISAAC SHUEKE ("Shueke"), MARK SNOWDON ("Snowdon"), MICHEL SOLOUNIAS ("Solounias"), RONY SOOD ("Sood"), ALVIN STEVENS ("A. Stevens"), PHILL STEVENS ("P. Stevens"), ALEXANDER STEVENSON ("Stevenson"), DAVID STRAUSS ("Strauss"), RATEB SULEIMAN ("Suleiman"), MARTIJN TIDEMAN ("Tideman"), KEVIN TOQE ("Toqe"), CHRISTOPHER TROIANO ("Troiano"), JOEL

VERDICO ("Verdico"), VAN VILCHEZ ("Vilchez"), ELMAR VON GROLMAN ("von Grolman"), ALAIN VOOGT ("Voogt"), SIMON WEHREN ("Wehren"), RYAN WERMERSKIRCHEN ("Wermershirchen"), DAVID JASON WEST ("West"), WEX CAPITAL LLC ("Wex Capital"), BRANDON WHITE ("White"), JOSHUA WHITNEY ("Whitney"), HANNAH WILKES ("Wilkes"), WADE WILSON ("Wilson"), ASHA WOO ("Woo"), RODERICK WRIGHT ("Wright"), JAIME YBARRA ("Ybarra"), ALI HAN YENISEHIRLIOGLU ("Yenisehirlioglu"), STEVE YOUNG ("Young"), RON ZABEL ("Zabel"), and ZEIN ZAIOUD ("Zaioud") (collectively referred to as "Plaintiffs") bring this Complaint against Defendants, STRONGBLOCK ("Strongblock"), DAVID MOSS ("Moss"), BRIAN ABRAMSON ("Abramson"), COREY LEDERER ("Lederer"), KOSTANTIN SHKUT ("Shkut"), and potential John Doe entities and individuals (collectively referred to as "Defendants"), and allege as follows, upon personal knowledge as to Plaintiffs' own acts and experiences, and, as to all other matters, upon information and belief, including an investigation conducted by Plaintiffs' attorneys.

## **INTRODUCTION**

1.     Strongblock is an unincorporated general partnership operating within the United States of which the individual Defendants are partners. From at least September 29, 2020, to the present (the "Relevant Period"), Defendants sold various Strongblock securities to Plaintiffs without registering those securities or complying with any exemption from registration.

2.     The securities sold by Defendants included Strongblock digital or crypto assets known as tokens and nodes. Defendants named the Strongblock tokens they sold STRNG and STRNGR. Defendants sold Strongblock nodes to Plaintiffs with the promise those nodes would provide daily token rewards in perpetuity. As an example, Strongblock sold "S1 nodes" to Plaintiffs for ten Strongblock tokens and promised those nodes would in turn earn Plaintiffs token

rewards on a *per diem* basis in perpetuity with no cap or limitation, something Defendants marketed as Node Universal Basic Income ("NUBI").

3.  Based on the facts and circumstances set forth below, the Strongblock tokens and nodes were securities under the federal securities laws. Purchasers of STRNG and STRNGR tokens and Strongblock nodes, including Plaintiffs, had a reasonable expectation of future profit based upon Defendant's efforts, including the development of the Strongblock network, its nodes, and its NUBI reward system, and the launch of a Strongchain blockchain Defendants are developing. Defendants violated at least Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without a registration statement or exemption from registration.

4.  Crypto-assets exist on a blockchain, which is a decentralized digital ledger that records all transactions. Following the creation of Bitcoin, which was the first prominent digital asset, the number of digital assets in general circulation has increased dramatically. There are many different kinds of crypto-assets; some closely resemble Bitcoin or other commodities, in that they are decentralized. For decentralized commodities, prices may rise or fall based upon supply and demand, but there is no centralized mechanism for creating more such commodities.

5.  In contrast, other digital assets are similar to traditional securities in that they represent one's investment in a project that is to be undertaken with the funds raised through the sale of the tokens and more specifically here, Nodes. Like traditional securities, investors purchase these tokens with the hope that their value will increase as the issuer that created the token uses its managerial efforts to create some use—typically described to investors in a "whitepaper"—that will give the token value.

6.  But despite the fact that the Strongblock tokens and nodes are securities, none of them are registered with the U.S. Securities and Exchange Commission ("SEC") or with state

regulators. This means that purchasers including Plaintiffs did not have access to disclosures that accompany the issuances of traditional securities. Rather, investors including Plaintiffs received—at most—only whitepapers, flash papers, blogs, and other articles ("Promotional Materials"), which described the tokens and nodes, but which did not satisfy the requirements for a prospectus under the securities laws. These Promotional Materials were often supplemented by Defendants with advertisements, social media postings, and Ask me Anything or "AMA" sessions hosted by Moss himself, that further promoted the Strongblock tokens and nodes for sale.

7.     Defendants promoted Strongblock as a "Blockchain Revolution" that provided consumers the ability to participate in, and profit from, the growth of blockchain infrastructure. To participate, Defendants required Plaintiffs first purchase Strongblock tokens that they could then use to purchase Strongblock nodes. Once a Strongblock node was purchased, Plaintiffs were guaranteed lifetime uncapped rewards to be paid to Plaintiffs in Strongblock tokens.

8.     Virtual networks like blockchains consist of groupings of data blocks stored on nodes that are linked together and exchange information between each other to ensure their information is contemporaneously maintained. As nodes store, distribute, and maintain blockchain data they are both common and vital to a blockchain's infrastructure. The more nodes a blockchain has, the more reliable, and thus valuable, that blockchain is to users and, in turn, owners of the nodes.

9.     Generally, nodes are classified as either "Full" or "Lightweight" nodes. "Full Nodes" act analogously to servers for a decentralized network by: (1) establishing consensuses between other nodes; (2) confirming transactions on a blockchain; and, (3) maintaining copies of a blockchain's data. "Full Nodes" are also often the only nodes that may vote on matters affecting the future of the blockchain and therefore play an integral role in the network's governance.

Strongblock marketed and advertised the nodes purchased by Plaintiffs as Full Nodes.

10.   The Strongblock nodes purchased by Plaintiffs were seen as a traditional securities investment in that Plaintiffs directly purchased nodes from Defendants for ten (10) Strongblock tokens[1] and were promised each node would then earn Plaintiffs a fractional amount of Strongblock token back on a per-diem basis in perpetuity, which Strongblock called NUBI rewards. Plaintiffs gave Defendants STRNG and STRNGR tokens in exchange for the creation of a Strongblock nodes with a per-diem "lifetime" reward to be paid in STRNG or STRNGR tokens.

11.   In February 2020, Strongblock appeared in the cryptocurrency space as a pioneer with the first working platform that incentivized individuals and entities alike to own nodes because it was the **only** platform providing rewards to node-holders. As Strongblock exploded with popularity, the Strongblock token price soared to an all-time high of approximately $1,200.00 per token. Defendants have sold over 500,000 Strongblock nodes, some for over $10,000 a piece. In selling their Strongblock nodes, Defendants promised daily rewards, in perpetuity, to Strongblock nodes owners.

12.   As explained in further detail below, Defendants pulled the rug out from under every node holder by arbitrarily and unilaterally capping in April 2022 the cumulative rewards that could be generated by an individual node, without notice and in contravention to their own express statements that node rewards would never go to zero. Further, these egregious unilateral changes by Strongblock constituted a material alteration of the terms, representations, and circumstances under which Plaintiffs bought the Strongblock nodes from Defendants to the

---

[1] The native token currently used by the Strongblock system is the STRNGR token. STRNGR is a derivative of its predecessor native token STRNG which was retired from meaningful use upon the projects need for an "upgrade" to STRNGR. The upgrade to STRNGR was based upon, *inter alia,* a prevailing need to mint additional native tokens which was provided for in the STRNGR smart contract. Strongblock did not have the ability to mint new STRNG tokens under the STRNG smart contract.

detriment of Plaintiffs, something Defendants knew or should have known would cause severe damage to Plaintiffs.

13.    Defendants sold millions of dollars of nodes to Plaintiffs based on the promise they would earn "lifetime" NUBI rewards. Defendants willfully and intentionally, or negligently, misrepresented the NUBI reward system to Plaintiffs to the material detriment of Plaintiffs.

14.    Because Defendants (1) sold bodes in violation of federal securities laws; (2) fraudulently induced Plaintiffs to buy Strongblock token and node securities; (3) fraudulently or negligently misrepresented Strongblock; (4) converted Plaintiffs assets; (5) defrauded Plaintiffs into transacting for nodes under the promise of "lifetime" rewards; (6) breached the promises made in selling nodes; and (7) mislead Plaintiffs as to the viability and sustainability of the "lifetime" rewards, Plaintiffs bring claims to recover damages, including at least the consideration they paid for Strongblock tokens and nodes, trading fees, interest thereon, as well as attorneys' fees and costs, and all other damages to the fullest extent permitted by law.

## **PARTIES**

15.    Plaintiff Abuda is an individual residing within Georgia, is otherwise *sui juris*, and invested approximately $95,813.85 purchasing Strongblock tokens and nodes from Defendants.

16.    Plaintiff Adamic is an individual residing within Wisconsin, is otherwise *sui juris*, and invested approximately $300,202.36 purchasing Strongblock tokens and nodes from Defendants.

17.    Plaintiff Advincula is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $55,115.79 purchasing Strongblock tokens and nodes from Defendants.

18.    Plaintiff Agiri is a foreign individual residing in Nigeria, is otherwise *sui juris*,

and invested approximately $21,397.55 purchasing Strongblock tokens and nodes from Defendants.

19.     Plaintiff Aguero is an individual residing in the state of New Jersey, is otherwise *sui juris*, and invested approximately $28,335.23 purchasing Strongblock tokens and nodes from Defendants.

20.     Plaintiff Aikman is a foreign individual residing in Canada, is otherwise *sui juris*, and invested approximately $161,725.83 purchasing Strongblock tokens and nodes from Defendants.

21.     Plaintiff Allan is a foreign individual residing in England, is otherwise *sui juris*, and invested approximately $13,170.37 purchasing Strongblock tokens and nodes from Defendants.

22.     Plaintiff AFM is a Nevada limited liability company and invested approximately $3,348,839.36 purchasing Strongblock tokens and nodes from Defendants.

23.     Plaintiff Alleyne is a foreign individual residing in England, is otherwise *sui juris*, and invested approximately $68,312.11 purchasing Strongblock tokens and nodes from Defendants.

24.     Plaintiff Antoine is an individual residing in the state of Connecticut, is otherwise *sui juris*, and invested approximately $59,455.24 purchasing Strongblock tokens and nodes from Defendants.

25.     Plaintiff Avidan is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $78,114.92 purchasing Strongblock tokens and nodes from Defendants.

26.     Plaintiff Bagley is an individual residing in the state of Arizona, is otherwise *sui juris*, and invested approximately $187,173.19 purchasing Strongblock tokens and nodes from Defendants.

27.     Plaintiff Balinton is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $37,195.98 purchasing Strongblock tokens and nodes from Defendants.

28.     Plaintiff Bamberger is an individual residing in the state of Wisconsin, is otherwise *sui juris*, and invested approximately $45,457.82 purchasing Strongblock tokens and nodes from Defendants.

29.     Plaintiff Barlow is an individual residing in the state of Tennessee, is otherwise *sui juris*, and invested approximately $5,220.30 purchasing Strongblock tokens and nodes from Defendants.

30.     Plaintiff Barnaby is an individual residing in Australia, is otherwise *sui juris*, and invested approximately $61,009.93 purchasing Strongblock tokens and nodes from Defendants.

31.     Plaintiff Barreras is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $128,386.50 purchasing Strongblock tokens and nodes from Defendants.

32.     Plaintiff Beal is an individual residing in the state of Kansas, is otherwise *sui juris*, and invested approximately $34,829.13 purchasing Strongblock tokens and nodes from Defendants.

33.     Plaintiff Beam is an individual residing in the state of Kentucky, is otherwise *sui juris*, and invested approximately $25,917.86 purchasing Strongblock tokens and nodes from

Defendants.

34.     Plaintiff Bekemeier is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $79,017.47 purchasing Strongblock tokens and nodes from Defendants.

35.     Plaintiff Belinsky is an individual residing in the state of New York, is otherwise *sui juris*, and invested approximately $103,168.41 purchasing Strongblock tokens and nodes from Defendants.

36.     Plaintiff Bhore is a foreign individual residing in England, is otherwise *sui juris*, and invested approximately $29,714.42 purchasing Strongblock tokens and nodes from Defendants.

37.     Plaintiff Bidzovski is a foreign individual residing in Australia, is otherwise *sui juris*, and invested approximately $86,787.28 purchasing Strongblock tokens and nodes from Defendants.

38.     Plaintiff Blakely is an individual residing in the state of Tennessee, is otherwise *sui juris*, and invested approximately $47,439.79 purchasing Strongblock tokens and nodes from Defendants.

39.     Plaintiff Branderhorst is an individual residing in the state of Arizona, is otherwise *sui juris*, and invested approximately $12,947.70 purchasing Strongblock tokens and nodes from Defendants.

40.     Plaintiff Bridges is a foreign individual residing in Australia, is otherwise *sui juris*, and invested approximately $75,055.62 purchasing Strongblock tokens and nodes from Defendants.

41.     Plaintiff Brown is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $110,679.16 purchasing Strongblock tokens and nodes from Defendants.

42.     Plaintiff Burgers is a foreign individual residing in Canada, is otherwise *sui juris*, and invested approximately $5,351.50 purchasing Strongblock tokens and nodes from Defendants.

43.     Plaintiff Bush is an individual residing in the state of Texas, is otherwise *sui juris*, and invested approximately $375,349.65 purchasing Strongblock tokens and nodes from Defendants.

44.     Plaintiff Buske is an individual residing in the state of Illinois, is otherwise *sui juris*, and invested approximately $40,477.68 purchasing Strongblock tokens and nodes from Defendants.

45.     Plaintiff Butbul is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $6,086.54 purchasing Strongblock tokens and nodes from Defendants.

46.     Plaintiff Cameron is a foreign individual residing within the United Arab Emirates, is otherwise *sui juris*, and invested approximately $27,326.90 purchasing Strongblock tokens and nodes from Defendants.

47.     Plaintiff Campbell is a foreign individual residing in Switzerland, is otherwise *sui juris*, and invested approximately $117,118.05 purchasing Strongblock tokens and nodes from Defendants.

48.     Plaintiff Canavan is a foreign individual residing in Ireland, is otherwise *sui juris*,

and invested approximately \$88,008.01 purchasing Strongblock tokens and nodes from Defendants.

49.     Plaintiff Capelnik is a foreign individual residing in Slovenia, is otherwise *sui juris*, and invested approximately \$12,653.81 purchasing Strongblock tokens and nodes from Defendants.

50.     Plaintiff Cargill is an individual residing in the state of New Hampshire, is otherwise *sui juris*, and invested approximately \$92,142.56 purchasing Strongblock tokens and nodes from Defendants.

51.     Plaintiff Cass is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately \$67,958.00 purchasing Strongblock tokens and nodes from Defendants.

52.     Plaintiff Castillo Puebla is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately \$48,435.33 purchasing Strongblock tokens and nodes from Defendants.

53.     Plaintiff Chan is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately \$17,634.10 purchasing Strongblock tokens and nodes from Defendants.

54.     Plaintiff Chase is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately \$233,313.24 purchasing Strongblock tokens and nodes from Defendants.

55.     Plaintiff Choe is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately \$40,235.22 purchasing Strongblock tokens and nodes from

Defendants.

56.     Plaintiff Choi is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $85,172.17 purchasing Strongblock tokens and nodes from Defendants.

57.     Plaintiff Cobey is an individual residing in the state of North Carolina, is otherwise *sui juris*, and invested approximately $86,451.27 purchasing Strongblock tokens and nodes from Defendants.

58.     Plaintiff Cordova is an individual residing in the state of Arizona, is otherwise *sui juris*, and invested approximately $40,255.10 purchasing Strongblock tokens and nodes from Defendants.

59.     Plaintiff Craig is an individual residing in the state of Illinois, is otherwise *sui juris*, and invested approximately $41,008.64 purchasing Strongblock tokens and nodes from Defendants.

60.     Plaintiff Crews is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $389,424.12 purchasing Strongblock tokens and nodes from Defendants.

61.     Plaintiff Cromwell is an individual residing in the state of Idaho, is otherwise *sui juris*, and invested approximately $24,744.53 purchasing Strongblock tokens and nodes from Defendants.

62.     Plaintiff Cruz is a foreign individual residing in the Philippines, is otherwise *sui juris*, and invested approximately $10,354.14 purchasing Strongblock tokens and nodes from Defendants.

63.     Plaintiff Dabadie is a foreign individual residing in France, is otherwise *sui juris*, and invested approximately $5,380.94 purchasing Strongblock tokens and nodes from Defendants.

64.     Plaintiff Dalto is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $37,526.65 purchasing Strongblock tokens and nodes from Defendants.

65.     Plaintiff C. Davis is an individual residing in the state of Washington, is otherwise *sui juris*, and invested approximately $37,956.62 purchasing Strongblock tokens and nodes from Defendants.

66.     Plaintiff P. Davis is an individual residing in the state of Colorado, is otherwise *sui juris*, and invested approximately $6,223.03 purchasing Strongblock tokens and nodes from Defendants.

67.     Plaintiff Dawood is an individual residing in the state of New Jersey, is otherwise *sui juris*, and invested approximately $2,244.62 purchasing Strongblock tokens and nodes from Defendants.

68.     Plaintiff Day is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $41,693.71 purchasing Strongblock tokens and nodes from Defendants.

69.     Plaintiff de Waal is a foreign individual residing in the Netherlands, is otherwise *sui juris*, and invested approximately $30,505.95 purchasing Strongblock tokens and nodes from Defendants.

70.     Plaintiff DeFeo is an individual residing in the state of Massachusetts, is otherwise

*sui juris*, and invested approximately $99,066.32 purchasing Strongblock tokens and nodes from Defendants.

71.     Plaintiff Derosas is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $66,565.50 purchasing Strongblock tokens and nodes from Defendants.

72.     Plaintiff DeYoung is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $197,737.04 purchasing Strongblock tokens and nodes from Defendants.

73.     Plaintiff Diaz is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $13,837.60 purchasing Strongblock tokens and nodes from Defendants.

74.     Plaintiff Dunn is an individual residing in the state of Georgia, is otherwise *sui juris*, and invested approximately $160,527.70 purchasing Strongblock tokens and nodes from Defendants.

75.     Plaintiff Ebrahimi is a foreign individual residing in Belgium, is otherwise *sui juris*, and invested approximately $5,197.62 purchasing Strongblock tokens and nodes from Defendants.

76.     Plaintiff ECET Inc. is a Florida corporation and invested approximately $259,641.38 purchasing Strongblock tokens and nodes from Defendants.

77.     Plaintiff Edwards is a foreign individual residing in England, is otherwise *sui juris*, and invested approximately $39,322.10 purchasing Strongblock tokens and nodes from Defendants.

78.     Plaintiff Ellis is a foreign individual residing in England, is otherwise *sui juris*, and invested approximately $15,272.08 purchasing Strongblock tokens and nodes from Defendants.

79.     Plaintiff Evergreen is a California general partnership and invested approximately $182,190.95 purchasing Strongblock tokens and nodes from Defendants.

80.     Plaintiff Fandunyan is an individual residing in the state of New Hampshire, is otherwise *sui juris*, and invested approximately $12,063.72 purchasing Strongblock tokens and nodes from Defendants.

81.     Plaintiff Faraci is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $15,714.77 purchasing Strongblock tokens and nodes from Defendants.

82.     Plaintiff Ferlazo is a foreign individual residing in Canada, is otherwise *sui juris*, and invested approximately $2,689.19 purchasing Strongblock tokens and nodes from Defendants.

83.     Plaintiff Ferraro is a foreign individual residing in Australia, is otherwise *sui juris*, and invested approximately $2,083.45 purchasing Strongblock tokens and nodes from Defendants.

84.     Plaintiff Foil is an individual residing in Texas, is otherwise *sui juris*, and invested approximately $46,777.36 purchasing Strongblock tokens and nodes from Defendants.

85.     Plaintiff Forsythe is an individual residing in Oregon, is otherwise *sui juris*, and invested approximately $36,017.32 purchasing Strongblock tokens and nodes from Defendants.

86.     Plaintiff Frankel is a foreign individual residing in Amsterdam, is otherwise *sui*

*juris*, and invested approximately $21,048.92 purchasing Strongblock tokens and nodes from Defendants.

87.     Plaintiff Frasinelli is an individual residing in the state of Tennessee, is otherwise *sui juris*, and invested approximately $120,734.12 purchasing Strongblock tokens and nodes from Defendants.

88.     Plaintiff Galka is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $1,686.41 purchasing Strongblock tokens and nodes from Defendants.

89.     Plaintiff Gaytan is a foreign individual residing in Mexico, is otherwise *sui juris*, and invested approximately $17,699.58 purchasing Strongblock tokens and nodes from Defendants.

90.     Plaintiff Gentile is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $7,082.27 purchasing Strongblock tokens and nodes from Defendants.

91.     Plaintiff Geter is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $45,513.12 purchasing Strongblock tokens and nodes from Defendants.

92.     Plaintiff Giacobbe is an individual residing in the state of New York, is otherwise *sui juris*, and invested approximately $121,953.47 purchasing Strongblock tokens and nodes from Defendants.

93.     Plaintiff Gill is an individual residing in England, is otherwise *sui juris*, and invested approximately $33,007.17 purchasing Strongblock tokens and nodes from Defendants.

94.     Plaintiff Gillmore is an individual residing in the state of Idaho, is otherwise *sui juris*, and invested approximately $104,323.79 purchasing Strongblock tokens and nodes from Defendants.

95.     Plaintiff Glen is an individual residing in Australia, is otherwise *sui juris*, and invested approximately $37,859.23 purchasing Strongblock tokens and nodes from Defendants.

96.     Plaintiff Global Perspective is a foreign corporation with a principal place of business located in Ireland and invested approximately $339,910.91 purchasing Strongblock tokens and nodes from Defendants.

97.     Plaintiff Globke is an individual residing in the state of Texas, is otherwise *sui juris*, and invested approximately $61,809.81 purchasing Strongblock tokens and nodes from Defendants.

98.     Plaintiff Gokumattella is an individual residing in the state of Massachusetts, is otherwise *sui juris*, and invested approximately $37,144.32 purchasing Strongblock tokens and nodes from Defendants.

99.     Plaintiff Gorman is a foreign individual residing in Australia, is otherwise *sui juris*, and invested approximately $15,026.47 purchasing Strongblock tokens and nodes from Defendants.

100.     Plaintiff Gould is an individual residing in the state of Washington, is otherwise *sui juris*, and invested approximately $141,061.50 purchasing Strongblock tokens and nodes from Defendants.

101.     Plaintiff Greentech Holdings is a British Virgin Islands corporation and invested approximately $1,194,388.69 purchasing Strongblock tokens and nodes from Defendants.

102.   Plaintiff Guedes Jr is an individual residing in the state of New York, is otherwise *sui juris*, and invested approximately $33,780.70 purchasing Strongblock tokens and nodes from Defendants.

103.   Plaintiff Hamad is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $1,528,870.07 purchasing Strongblock tokens and nodes from Defendants.

104.   Plaintiff Harber is an individual residing in the state of Texas, is otherwise *sui juris*, and invested approximately $17,510.82 purchasing Strongblock tokens and nodes from Defendants.

105.   Plaintiff Daniel Hargrove is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $64,943.45 purchasing Strongblock tokens and nodes from Defendants.

106.   Plaintiff David Hargrove is an individual residing in the state of Oregon, is otherwise *sui juris*, and invested approximately $63,851.44 purchasing Strongblock tokens and nodes from Defendants.

107.   Plaintiff Harris is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $292,417.48 purchasing Strongblock tokens and nodes from Defendants.

108.   Plaintiff Hittenmark is an individual residing in the state of Michigan, is otherwise *sui juris*, and invested approximately $223,677.59 purchasing Strongblock tokens and nodes from Defendants.

109.   Plaintiff Hourihan is an individual residing in the state of Florida, is otherwise *sui*

*juris*, and invested approximately $81,952.50 purchasing Strongblock tokens and nodes from Defendants.

110.    Plaintiff Howell is an individual residing in the state of Nevada, is otherwise *sui juris*, and invested approximately $23,052.63 purchasing Strongblock tokens and nodes from Defendants.

111.    Plaintiff Hurst is an individual residing in the state of Colorado, is otherwise *sui juris*, and invested approximately $33,856.62 purchasing Strongblock tokens and nodes from Defendants.

112.    Plaintiff Imoede is an individual residing in the state of Georgia, is otherwise *sui juris*, and invested approximately $78,920.61 purchasing Strongblock tokens and nodes from Defendants.

113.    Plaintiff Ismanovski is a foreign individual residing in Netherlands, is otherwise *sui juris*, and invested approximately $21,716.18 purchasing Strongblock tokens and nodes from Defendants.

114.    Plaintiff Jeffress is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $14,030.35 purchasing Strongblock tokens and nodes from Defendants.

115.    Plaintiff Johnson is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $25,184.33 purchasing Strongblock tokens and nodes from Defendants.

116.    Plaintiff B. Jones is an individual residing in the state of Oregon, is otherwise *sui juris*, and invested approximately $199,021.31 purchasing Strongblock tokens and nodes from

Defendants.

117.   Plaintiff R. Jones is a foreign individual residing in Australia, is otherwise *sui juris*, and invested approximately $986.26 purchasing Strongblock tokens and nodes from Defendants.

118.   Plaintiff Kamis is an individual residing in the state of Texas, is otherwise *sui juris*, and invested approximately $11,239.30 purchasing Strongblock tokens and nodes from Defendants.

119.   Plaintiff Karmazin is a foreign individual residing in Australia, is otherwise *sui juris*, and invested approximately $12,154.95 purchasing Strongblock tokens and nodes from Defendants.

120.   Plaintiff Khalid is a foreign individual residing in England, is otherwise *sui juris*, and invested approximately $121,008.31 purchasing Strongblock tokens and nodes from Defendants.

121.   Plaintiff Khazanov is an individual residing in the state of Tennessee, is otherwise *sui juris*, and invested approximately $192,256.85 purchasing Strongblock tokens and nodes from Defendants.

122.   Plaintiff King is a foreign individual residing in South Africa, is otherwise *sui juris*, and invested approximately $67,376.63 purchasing Strongblock tokens and nodes from Defendants.

123.   Plaintiff Kirkham is an individual residing in the state of Idaho, is otherwise *sui juris*, and invested approximately $63,461.13 purchasing Strongblock tokens and nodes from Defendants.

124. Plaintiff Kissee Jr. is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $13,765.02 purchasing Strongblock tokens and nodes from Defendants.

125. Plaintiff Landvreugd is a foreign individual residing in the Netherlands, is otherwise *sui juris*, and invested approximately $54,089.07 purchasing Strongblock tokens and nodes from Defendants.

126. Plaintiff LaPierre is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $32,470.30 purchasing Strongblock tokens and nodes from Defendants.

127. Plaintiff Lazzaro is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $47,173.56 purchasing Strongblock tokens and nodes from Defendants.

128. Plaintiff Leleux is an individual residing in the state of Louisiana, is otherwise *sui juris*, and invested approximately $140,846.20 purchasing Strongblock tokens and nodes from Defendants.

129. Plaintiff Levi is an individual residing in the state of Tennessee, is otherwise *sui juris*, and invested approximately $17,644.23 purchasing Strongblock tokens and nodes from Defendants.

130. Plaintiff Levin is an individual residing in the state of Illinois, is otherwise *sui juris*, and invested approximately $20,561.62 purchasing Strongblock tokens and nodes from Defendants.

131. Plaintiff Li is a foreign individual residing in Canada, is otherwise *sui juris*, and

invested approximately $12,664.61 purchasing Strongblock tokens and nodes from Defendants.

132.    Plaintiff Liles is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $119,625.93 purchasing Strongblock tokens and nodes from Defendants.

133.    Plaintiff Littlechild is a foreign individual residing in England, is otherwise *sui juris*, and invested approximately $61,937.32 purchasing Strongblock tokens and nodes from Defendants.

134.    Plaintiff Lovell is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $39,050.76 purchasing Strongblock tokens and nodes from Defendants.

135.    Plaintiff Luo is a foreign individual residing in China, is otherwise *sui juris*, and invested approximately $19,636.85 purchasing Strongblock tokens and nodes from Defendants.

136.    Plaintiff Mann is a foreign individual residing in Australia, is otherwise *sui juris*, and invested approximately $4,980.56 purchasing Strongblock tokens and nodes from Defendants.

137.    Plaintiff Markley is an individual residing in the state of Illinois, is otherwise *sui juris*, and invested approximately $27,837.44 purchasing Strongblock tokens and nodes from Defendants.

138.    Plaintiff Martin is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $67,024.48 purchasing Strongblock tokens and nodes from Defendants.

139.    Plaintiff Mationschek is a foreign individual residing in South Africa, is otherwise

*sui juris*, and invested approximately $60,972.05 purchasing Strongblock tokens and nodes from Defendants.

140.    Plaintiff McCauley is an individual residing in the state of Oregon, is otherwise *sui juris*, and invested approximately $5,061.86 purchasing Strongblock tokens and nodes from Defendants.

141.    Plaintiff C. McCormick is an individual residing in the state of New York, is otherwise *sui juris*, and invested approximately $192,379.57 purchasing Strongblock tokens and nodes from Defendants.

142.    Plaintiff O. McCormick is an individual residing in the state of New York, is otherwise *sui juris*, and invested approximately $11,199.57 purchasing Strongblock tokens and nodes from Defendants.

143.    Plaintiff McCoy is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $34,131.74 purchasing Strongblock tokens and nodes from Defendants.

144.    Plaintiff McKinnon is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $35,934.00 purchasing Strongblock tokens and nodes from Defendants.

145.    Plaintiff Medina is an individual residing in the state of Texas, is otherwise *sui juris*, and invested approximately $35,694.38 purchasing Strongblock tokens and nodes from Defendants.

146.    Plaintiff Melo Fernandez is an individual residing in the state of New Mexico, is otherwise *sui juris*, and invested approximately $5,848.22 purchasing Strongblock tokens and

nodes from Defendants.

147.    Plaintiff Mera is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $41,259.09 purchasing Strongblock tokens and nodes from Defendants.

148.    Plaintiff Merwin is an individual residing in the state of New Hampshire, is otherwise *sui juris*, and invested approximately $606,478.41 purchasing Strongblock tokens and nodes from Defendants.

149.    Plaintiff Milenkovic is a foreign individual residing in Canada, is otherwise *sui juris*, and invested approximately $65,478.25 purchasing Strongblock tokens and nodes from Defendants.

150.    Plaintiff Miller is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $40,688.78 purchasing Strongblock tokens and nodes from Defendants.

151.    Plaintiff Muhamad Husain is an individual residing in California, is otherwise *sui juris*, and invested approximately $19,920.45 purchasing Strongblock tokens and nodes from Defendants.

152.    Plaintiff Muinos is a foreign individual residing in Spain, is otherwise *sui juris*, and invested approximately $12,434.03 purchasing Strongblock tokens and nodes from Defendants.

153.    Plaintiff Muniz is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $72,309.54 purchasing Strongblock tokens and nodes from Defendants.

154. Plaintiff Nguyen 1 is an individual residing in the state of New York, is otherwise *sui juris*, and invested approximately $62,685.50 purchasing Strongblock tokens and nodes from Defendants.

155. Plaintiff Nguyen 2 is an individual residing in the state of Texas, is otherwise *sui juris*, and invested approximately $209,715.61 purchasing Strongblock tokens and nodes from Defendants.

156. Plaintiff M. L. Nguyen is an individual residing in the state of Texas, is otherwise *sui juris*, and invested approximately $29,121.71 purchasing Strongblock tokens and nodes from Defendants.

157. Plaintiff T. Nguyen is an individual residing in the state of Utah, is otherwise *sui juris*, and invested approximately $597,717.12 purchasing Strongblock tokens and nodes from Defendants.

158. Plaintiff Nickel is a foreign individual residing in Canada, is otherwise *sui juris*, and invested approximately $51,169.59 purchasing Strongblock tokens and nodes from Defendants.

159. Plaintiff Nieuwenhuis is a foreign individual residing in the Netherlands, is otherwise *sui juris*, and invested approximately $20,877.63 purchasing Strongblock tokens and nodes from Defendants.

160. Plaintiff Nsana is an individual residing in the state of New Jersey, is otherwise *sui juris*, and invested approximately $45,317.88 purchasing Strongblock tokens and nodes from Defendants.

161. Plaintiff Olson is an individual residing in the state of Texas, is otherwise *sui juris*,

and invested approximately $30,644.62 purchasing Strongblock tokens and nodes from Defendants.

162.     Plaintiff Osman is a foreign individual residing in Australia, is otherwise *sui juris*, and invested approximately $9,264.60 purchasing Strongblock tokens and nodes from Defendants.

163.     Plaintiff Owen is an individual residing in the state of Oregon, is otherwise *sui juris*, and invested approximately $134,382.64 purchasing Strongblock tokens and nodes from Defendants.

164.     Plaintiff Pakal is an individual residing in the state of New Jersey, is otherwise *sui juris*, and invested approximately $63,472.77 purchasing Strongblock tokens and nodes from Defendants.

165.     Plaintiff Palacios is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $51,658.12 purchasing Strongblock tokens and nodes from Defendants.

166.     Plaintiff Peaker is a foreign individual residing in Canada, is otherwise *sui juris*, and invested approximately $74,276.81 purchasing Strongblock tokens and nodes from Defendants.

167.     Plaintiff Pena is an individual residing in the state of Maryland, is otherwise *sui juris*, and invested approximately $33,523.66 purchasing Strongblock tokens and nodes from Defendants.

168.     Plaintiff Pentland is a foreign individual residing in Australia, is otherwise *sui juris*, and invested approximately $30,653.22 purchasing Strongblock tokens and nodes from

Defendants.

169.    Plaintiff Peters is an individual residing in the state of Arizona, is otherwise *sui juris*, and invested approximately $157,081.56 purchasing Strongblock tokens and nodes from Defendants.

170.    Plaintiff Pulley is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $64,183.33 purchasing Strongblock tokens and nodes from Defendants.

171.    Plaintiff Rameshni is an individual residing in the state of Illinois, is otherwise *sui juris*, and invested approximately $98,400.16 purchasing Strongblock tokens and nodes from Defendants.

172.    Plaintiff Reay is a foreign individual residing in England, is otherwise *sui juris*, and invested approximately $19,335.20 purchasing Strongblock tokens and nodes from Defendants.

173.    Plaintiff Reid is a foreign individual residing in Thailand, is otherwise *sui juris*, and invested approximately $77,450.17 purchasing Strongblock tokens and nodes from Defendants.

174.    Plaintiff Revivo is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $35,257.61 purchasing Strongblock tokens and nodes from Defendants.

175.    Plaintiff Robinson is an individual residing in the state of Arizona, is otherwise *sui juris*, and invested approximately $59,476.14 purchasing Strongblock tokens and nodes from Defendants.

176. Plaintiff Ronca is an individual residing in the state of Texas, is otherwise *sui juris*, and invested approximately $404,394.18 purchasing Strongblock tokens and nodes from Defendants.

177. Plaintiff Ross is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $6,124.67 purchasing Strongblock tokens and nodes from Defendants.

178. Plaintiff Ryan is an individual residing in the state of New Jersey, is otherwise *sui juris*, and invested approximately $98,578.25 purchasing Strongblock tokens and nodes from Defendants.

179. Plaintiff Schwab is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $842,037.50 purchasing Strongblock tokens and nodes from Defendants.

180. Plaintiff Sermouh is a foreign individual residing in France, is otherwise *sui juris*, and invested approximately $34,919.77 purchasing Strongblock tokens and nodes from Defendants.

181. Plaintiff Shields is a foreign individual residing in Canada, is otherwise *sui juris*, and invested approximately $5,718.59 purchasing Strongblock tokens and nodes from Defendants.

182. Plaintiff Shueke is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $145,642.93 purchasing Strongblock tokens and nodes from Defendants.

183. Plaintiff Snowdon is a foreign individual residing in Ireland, is otherwise *sui juris*,

and invested approximately $23,882.95 purchasing Strongblock tokens and nodes from Defendants.

184.    Plaintiff Solounias is an individual residing in the state of New York, is otherwise *sui juris*, and invested approximately $5,047.94 purchasing Strongblock tokens and nodes from Defendants.

185.    Plaintiff Sood is a foreign individual residing in Australia, is otherwise *sui juris*, and invested approximately $163,532.64 purchasing Strongblock tokens and nodes from Defendants.

186.    Plaintiff A. Stevens is an individual residing in the state of Virginia, is otherwise *sui juris*, and invested approximately $50,941.89 purchasing Strongblock tokens and nodes from Defendants.

187.    Plaintiff P. Stevens is an individual residing in the state of Utah, is otherwise *sui juris*, and invested approximately $244,297.11 purchasing Strongblock tokens and nodes from Defendants.

188.    Plaintiff Stevenson is an individual residing in the state of Arizona, is otherwise *sui juris*, and invested approximately $40,217.82 purchasing Strongblock tokens and nodes from Defendants.

189.    Plaintiff Strauss is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $15,590.44 purchasing Strongblock tokens and nodes from Defendants.

190.    Plaintiff Suleiman is an individual residing in the state of Louisiana, is otherwise *sui juris*, and invested approximately $11,797.45 purchasing Strongblock tokens and nodes from

Defendants.

191.     Plaintiff Tideman is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $284,112.59 purchasing Strongblock tokens and nodes from Defendants.

192.     Plaintiff Toqe is an individual residing in the state of South Carolina, is otherwise *sui juris*, and invested approximately $13,130.80 purchasing Strongblock tokens and nodes from Defendants.

193.     Plaintiff Troiano is an individual residing in the state of Kentucky, is otherwise *sui juris*, and invested approximately $24,132.43 purchasing Strongblock tokens and nodes from Defendants.

194.     Plaintiff Verdico is an individual residing in the state of Arizona, is otherwise *sui juris*, and invested approximately $98,073.88 purchasing Strongblock tokens and nodes from Defendants.

195.     Plaintiff Vilchez is an individual residing in the state of Texas, is otherwise *sui juris*, and invested approximately $57,791.97 purchasing Strongblock tokens and nodes from Defendants.

196.     Plaintiff von Grolman is an individual residing in the state of Virginia, is otherwise *sui juris*, and invested approximately $52,232.83 purchasing Strongblock tokens and nodes from Defendants.

197.     Plaintiff Voogt is a foreign individual residing in the Netherlands, is otherwise *sui juris*, and invested approximately $15,692.37 purchasing Strongblock tokens and nodes from Defendants.

198.    Plaintiff Wehren is a foreign individual residing in England, is otherwise *sui juris*, and invested approximately $28,031.41 purchasing Strongblock tokens and nodes from Defendants.

199.    Plaintiff Wermerskirchen is an individual residing in the state of Minnesota, is otherwise *sui juris*, and invested approximately $164,018.53 purchasing Strongblock tokens and nodes from Defendants.

200.    Plaintiff West is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $83,752.66 purchasing Strongblock tokens and nodes from Defendants.

201.    Plaintiff Wex Capital LLC is Georgia limited liability company and invested approximately $492,816.58 purchasing Strongblock tokens and nodes from Defendants.

202.    Plaintiff White is an individual residing in the state of Missouri, is otherwise *sui juris*, and invested approximately $156,123.20 purchasing Strongblock tokens and nodes from Defendants.

203.    Plaintiff Whitney is an individual residing in the state of Tennessee, is otherwise *sui juris*, and invested approximately $41,821.14 purchasing Strongblock tokens and nodes from Defendants.

204.    Plaintiff Wilkes is an individual residing in the state of Texas, is otherwise *sui juris*, and invested approximately $24,990.93 purchasing Strongblock tokens and nodes from Defendants.

205.    Plaintiff Wilson is an individual residing in the state of Wisconsin, is otherwise *sui juris*, and invested approximately $33,377.08 purchasing Strongblock tokens and nodes from

Defendants.

206.    Plaintiff Woo is an individual residing in the state of North Carolina, is otherwise *sui juris*, and invested approximately $33,341.19 purchasing Strongblock tokens and nodes from Defendants.

207.    Plaintiff Wright is an individual residing in the state of Texas, is otherwise *sui juris*, and invested approximately $48,709.59 purchasing Strongblock tokens and nodes from Defendants.

208.    Plaintiff Ybarra is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $20,142.40 purchasing Strongblock tokens and nodes from Defendants.

209.    Plaintiff Yenisehirlioglu is a foreign individual residing in Australia, is otherwise *sui juris*, and invested approximately $27,241.98 purchasing Strongblock tokens and nodes from Defendants.

210.    Plaintiff Young is an individual residing in the state of California, is otherwise *sui juris*, and invested approximately $618,036.89 purchasing Strongblock tokens and nodes from Defendants.

211.    Plaintiff Zabel is a foreign individual residing in the Netherlands, is otherwise *sui juris*, and invested approximately $68,130.79 purchasing Strongblock tokens and nodes from Defendants.

212.    Plaintiff Zaioud is an individual residing in the state of Florida, is otherwise *sui juris*, and invested approximately $156,912.57 purchasing Strongblock tokens and nodes from Defendants.

37

213.   Defendant, STRONGBLOCK is an unincorporated general partnership operating within the United States. Moss, Abramson, Lederer and Shkut, along with other John Does, are partners in Strongblock.

214.   Defendant, Moss, is the CEO and Founder of Strongblock and an individual who, upon information and belief, is a citizen of the United States and a resident of California.

215.   Defendant, Abramson, is the Chief Technical Officer of Strongblock and an individual who, upon information and belief, is a citizen of the United States and a resident of California.

216.   Defendant, Lederer, is the Chief Product Officer of Strongblock and an individual who upon information and belief, is a citizen of the United States and a resident of Oregon.

217.   Defendant, Shkut, is the Lead Developer of Strongblock and an individual who upon information and belief, is a citizen of the United States and a resident of Washington.

## JURISDICTION AND VENUE

218.   Jurisdiction is proper under 28 U.S.C. § 1331 because the Complaint asserts claims under Sections 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o. This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v.

219.   Jurisdiction over Plaintiffs state law claims is proper under 28 U.S.C. § 1367(a) because district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Therefore, the elements of federal question and supplemental jurisdiction have been met.

220.   This Court has personal jurisdiction over Defendants because Defendants

transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the challenged conduct throughout the United States, including in this District. Defendants' acts were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including this District.

221.     This Court also has personal jurisdiction over Defendants and proper venue over this action under Section 22 of the securities Act, 15 U.S.C. § 77v.

222.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants are deemed to reside in any judicial district in which it is subject to the Court's personal jurisdiction, and because Defendants provide and market their services within the United States of America, and in this District, thereby establishing sufficient contacts to subject them to personal jurisdiction. Further, Defendants' conduct against Plaintiffs has occurred, in part, within the State of New York as the harmful effects of Defendants' alleged conduct were suffered within the State of New York, as well as, any other states that Plaintiffs are residents of.

## SUBSTANTIVE ALLEGATIONS

### A.  Blockchains and the Foundations of Digital Assets

223.     This case concerns crypto-assets.[2] Crypto-assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer. The key technology allowing the creation of crypto-assets is a blockchain.

224.     The challenge that had previously prevented the creation of digital assets is the

---

[2] One commonly used umbrella term that collectively describes the many different types of digital assets and the many hundreds of digital tokens in circulation is "cryptocurrencies." In order to avoid embedding any assumptions about the nature of these assets in this umbrella term, Plaintiffs herein use the term "crypto-assets" to describe the full range of digital assets. It may or may not be appropriate to call any particular digital or crypto asset a currency.

need to allow for secure transfers to exactly one recipient at a time. In general, digital files are transmitted by duplication; if someone emails a photograph to a friend, both the sender and the recipient now have copies of the photograph. While that duplication is helpful for a photograph, it would quickly make any digital asset valueless through duplication and inflation, as one individual could send the same digital asset to many counterparties. The elaborate measures used to prevent counterfeiting of physical currencies do not have effective digital analogues.

225.    Bitcoin, which was the first prominent digital asset, solved this problem with a digital ledger system called a "blockchain," which tracks the ownership and transfer of every Bitcoin in existence. Each Bitcoin user has a digital "address" used to receive Bitcoin. The Bitcoin blockchain lists, publicly, every address and the number of Bitcoin associated with that address. By looking at the Bitcoin blockchain, anyone can see every Bitcoin transaction in which that address has engaged.

226.    By providing a full transaction history of each Bitcoin, the blockchain allows for the secure exchange of all Bitcoin. Any attempt to duplicate a Bitcoin or to transfer it to multiple people at once would be futile, because a Bitcoin user could use the blockchain to verify each transaction involving that Bitcoin. There is thus no effective way to counterfeit Bitcoin.

227.    The blockchain has become the foundational technology for crypto-assets. While crypto-assets vary tremendously, they generally rely on the blockchain to ensure that transactions are secure and non-duplicable.

228.    Control of crypto-assets is attested primarily through control of cryptographic keys. These cryptographic keys have two components: a public key and a private key. This cryptographic system of transfer and exchange is generally the same across most crypto-assets.

229.    To use Bitcoin as an example, the public key is used to produce the Bitcoin address.

40

A Bitcoin address is a destination for transfers of Bitcoin, like the account number of a conventional bank account. Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters appearing in the string, such as 1s5F or R3w9. A private key allows the owner of a Bitcoin address to access it, like a long PIN or password for a conventional bank account.

230.    Those who wish to transfer Bitcoin need to know the recipient's Bitcoin address, just as one transferring funds to a conventional bank account needs to know the account number for that account. When they have the recipient's address, transferors can use their private keys to authorize the transfer of Bitcoin, just as one would use a PIN or password to authorize a transfer between traditional bank accounts.

231.    A transfer of Bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred. That is, anyone could see that Bitcoin address 1s5F transferred 10.3 Bitcoin to Bitcoin address R3w9. The names of the individuals or entities that control these addresses, on the other hand, are not recorded on the blockchain and not accessible to the public.

232.    While the blockchain allows for secure and non-duplicable transfers of digital assets, it does not do anything to connect users to each other or to automate both sides of a transfer. The desire for locations that enabled the trading of digital assets led to the creation of crypto-exchanges. Crypto-exchanges emerged to enable smoother and faster trading between investors, just as stock and commodities exchanges emerged to enable easy trading of securities.

233.    There are two primary types of crypto-exchange: decentralized exchanges and centralized exchanges.

234.    Decentralized exchanges may use the blockchain itself to match and execute

transactions among traders. There is no intermediary individual or corporation that matches or clears transactions; instead, they use a blockchain technology called a "smart contract" to automatically facilitate trading. While different decentralized exchanges use different approaches, what they have in common is that the crypto-assets are transferred between individual accounts. Thus, if Angela exchanges one Bitcoin for 10 Ethereum using a decentralized exchange, her one Bitcoin will be sent to David, another user on the platform, and David's 10 Ethereum will be sent to Angela.

235.     These decentralized exchanges resemble Ebay or Craigslist in their operation. Just like a purchase of a collectible baseball card on Ebay or Craigslist involves one user sending money and the other sending the card, so too do transactions on decentralized exchanges involve customers sending each other the goods being transacted. These decentralized exchanges, like Ebay and Craigslist, do not own or hold the assets in question—they simply provide a platform for exchanges between users, along with some features designed to facilitate trading (e.g., Ebay's listings, Craigslist's message boards, or a decentralized exchange's smart contracts), possibly in exchange for advertising revenue or a transaction fee.

236.     Strongblock's native tokens STRNG and STRNGR could only be transacted for through decentralized exchanges, and the nodes were purchased from Defendants directly through the use of their Strongblock website Strongblock.io.

237.     Buying, selling, and trading cryptocurrencies on a decentralized exchange may only occur through the use of an electronic wallet connected to the decentralized network ("DeFi Wallet"). A DeFi Wallet is substantially similar in identity to that of a bitcoin address as it is identified by a unique string of alphanumeric characters, often abbreviated by a small group of numbers and letters appearing in the string, such as 1s5F or R3w9 ("DeFi Wallet Address").

238.    All DeFi Wallet transactions are recorded and logged on a blockchain.

239.    Virtual networks like a blockchain consist of groupings of data blocks that are stored on nodes.

240.    Nodes on a blockchain are linked together and exchange information between each other to ensure information is contemporaneously maintained.

241.    As nodes store, distribute, and maintain blockchain data they are both common and vital to a Blockchain's infrastructure.

242.    Generally, nodes are classified as either "Full" or "Lightweight" nodes.

243.    Full Nodes act analogously to servers for a DeFi Network by (1) establishing consensuses between other nodes; (2) confirming transactions on a blockchain; (3) and maintaining copies of a blockchain's data.

244.    Full Nodes are also the only nodes that may vote on matters affecting the future of a Blockchain network and therefore play an integral role in a network's community governance.

### *B.* **Strongblock Generally**

245.    Strongblock is a DeFi NaaS protocol utilizing the native cryptocurrency tokens known as STRNG or STRNGR.

246.    Strongblock's executive team is comprised of Moss, Lederer, Abramson, and Shkut.

247.    Moss, Lederer, and Abramson are former executives of a company known as Block.one, a company that raised approximately $4 billion dollars in an initial coin offering ("ICO"), which resulted in a class-action lawsuit brought against it, *Williams, et. al. v. Block.one*, Case No.: 1:20-cv-02809-LAK. Block.one additionally paid the SEC approximately $24 Million dollars in civil penalties resulting from a separate administrative proceeding in 2019.

248.    Defendants launched a website, Strongblock.io, and published various technical papers such as a "Flash Paper", a "Light Paper", a "Medium Article", and a "Strongblock v3 Paper" to market, advertise, and disseminate information about the Strongblock NaaS protocol, its native ERC-20 Tokens, and the NUBI rewards.

249.    Defendants additionally engaged in social media posts, AMA sessions, and communicated with digital media journalists for the purpose of marketing the Strongblock NaaS protocol, its native ERC-20 Tokens, and the NUBI rewards.

250.    At all times material to this action, the primary DeFi network for buying, selling, and trading STRNG and STRNGR was the automated Ethereum-based cryptocurrency exchange known as Uniswap ("Uniswap").

251.    STRNG and STRNGR are ERC-20 Tokens created by Strongblock and purposed for enabling decentralized protocol governance.

252.    Currently, STRNGR serves two main functions: (1) 10 STRNGR are required to buy a node; and (2) STRNGR is the reward token distributed to node holders as NUBI rewards.

253.    The Strongblock system offers the ability to build nodes on various cryptocurrency networks and Plaintiffs are or were owners of at least Strongblock Ethereum 1.0 Nodes ("S1 Nodes"). Buying an S1 Nodes required Plaintiffs to enter into an electronic agreement ("Node Contract"). S1 Nodes were described, advertised, and marketed by Defendants as "Full Nodes".

254.    NUBI rewards generated by S1 Nodes were referred to by Defendants as "lifetime" rewards and have been provided to the S1 Node holders *per diem*, in the form of STRNG and STRNGR tokens since as early as December of 2020.

255.    On September 29, 2020, David Moss publicly advertised that Strongblock was purposed for "creating a true public good by rewarding nodes, providing more stability to

blockchains, and increasing visibility to the nodes that keep Blockchains running."

256.    On December 12, 2020, Defendants published the Flash Paper advertising their NaaS Protocol as the first and only blockchain agnostic protocol to reward nodes for supporting the infrastructure of their blockchain.

257.    As stated through Defendants' Flash Paper:

Why incentivize nodes? With limited resources and no financial incentive, many nodes run out-of-date software, maintain incomplete blockchain histories, and are intermittently off-line. There is no easy mechanism to fix this problem once a blockchain is launched. To solve this, StrongBlock has made it possible for anyone to create a node in seconds—or add their own node— and receive STRONG token rewards every day. More nodes equals more resilience. At the time of writing, StrongBlock is rewarding over 1700 Ethereum 1.0 nodes, representing more than 15% of all Ethereum active nodes.

258.    The function and purpose of the NUBI reward system was to facilitate the creation of a blockchain ecosystem where node holders are rewarded for regularly maintaining compliant nodes created on the Strongblock system.

259.    Defendants' goals were to "shine a spotlight on the most undervalued group in blockchain: nodes." Defendants marketed and advertised their NaaS protocol to persons across the globe, "capitalizing on the network effect from engaged communities" with the intention of inducing individuals and entities into buying S1 Nodes from Defendants relying on the representations of "lifetime" NUBI rewards.

260.    Defendants marketed the Strongblock system as part of the "blockchain revolution" and that through the NaaS app one could "launch a blockchain node in seconds and get rewards." Defendants made it possible for anyone to create a node in seconds and receive token rewards daily with the intention of marketing and advertising the Strongblock system to all persons, regardless of stature or circumstance.

261.    Defendants published a quick and easy five-step step process for joining in on the

"blockchain revolution" and creating nodes:

- Step 1: Get STRNG/STRNGR and Etherum ("ETH");

- Step 2: Name your node;

- Step 3: Confirm Wallet Transactions;

- Step 4: Node Created; and

- Step 5: Start Earning

### *The Node Contract*

262.    Buying an S1 Node is done by way of executing a Node Contract and spending ten (10) STRNG/STRNGR tokens on the "Strongblock App". The Strongblock system requires execution of the Node Contract prior to the creation of any node. Per the Node Contract node holders could not sell or transfer their nodes to other wallets. However, node owners can sell a wallet that possesses a node, as wallets are freely transferable digital assets.

263.    Defendants have sold over 500,000 nodes, including several hundred to Plaintiffs, some at a price of several thousand dollars each.

264.    The Node Contract for S1 Nodes additionally requires the payment of a maintenance fee of $14.95 USD upon creation of the S1 Node and payment in the same amount as a recurring monthly maintenance fee. Should a node holder fail to pay the monthly maintenance fee, the Node Contract terminates the overdue node in an automated fashion. S1 Node Holders are required to remit these payments manually because maintenance fees "cannot be automatically paid" from DeFI Wallets given the way Strongblock was developed by Defendants. Upon information and belief, Defendants have collected approximately Seven Million Dollars ($7,000,000.00) per month in maintenance fees.

265.    In exchange for creating compliant S1 Nodes on the Strongblock system and

remitting monthly maintenance fees toward each created node, S1 Node holders received daily

NUBI rewards in the form of a flat amount of STRNG and STRNGR tokens.

### C.  MOSS and Strongblock's Public Representations

266.    David Moss intentionally engaged media outlets, to advertise Strongblock's S1

Nodes, and share information about the Strongblock team and system's intentions and goals.

267.    In an article published by Robert Stevens in September of 2020, *Former*

*Block.one Execs Launch Tech to Make Ethereum More Secure: StrongBlock rewards people*

*operating full blockchain nodes. It's tapped Chainlink's decentralized price oracle tech to help*

*it out.*, Moss stated:

- Stronblock's team and shareholders hold the bulk of the supply of the native token.

- There is **<u>zero</u>** possibility of the Strongblock team dumping the approximate 53% of the native token supply cumulatively held by the same.

- Strongblock's goal was to "shine a spotlight on the most undervalued group in blockchain: nodes. Our 'DeFi with a purpose' protocol creates a true public good by rewarding nodes, providing more stability to blockchains, and increasing visibility to the nodes that keep blockchains running";

- Holders of Strongblock's native token can vote on proposals to upgrade the network, and can also sell those voting rights to strangers on secondary markets.

- Strongblock's native token was being held in locked wallets.

- Approximately 500,000 of the native Strongblock token were held in reserve as a "community chest".

268.    In an online article published by Alex Metzger, *Enterprise Blockchains have*

*an Achilles heel: A conversation with StrongBlock's David Moss,* on October 29, 2020, Moss

stated:

- The platform was designed for both individuals and Enterprises. It was made to be super-easy to configure and set up a blockchain and create applications so that anyone was able to utilize their platform and earn token rewards on a daily basis.

- The design of the NaaS protocol and the STRNG token for its governance was part of a "DeFi with a purpose" approach which intented to provide rewards for full S1 Nodes so that they could participate in governance of the protocol.

- Anyone can run a full Ethereum node. Some of the nodes we have approved are Enterprise-level nodes. Others have been created by individuals with low-level hardware. As long as they qualify as a full Ethereum node – that they have a full copy of the Ethereum blockchain – and have addressable endpoints, they're eligible. We will be continually expanding and updating our qualifying criteria.

269.     During an Ask Me Anything (AMA) session with the prominent cryptocurrency media outlet, "KuCoin", published February 21, 2021 and titled *The Growing Need to Incenvtivize Nodes and Why STRONG Tokens Are the Answer—KuCoin AMA With StrongBlock CEO David Moss*, Moss publicly stated that Strongblock was already incentivizing over 8,000 S1 Nodes and that "everything we built will be turned over to be governed by the community."

270.     During this AMA session, Moss advertised that the Strongblock system's unique features as:

- 2-click node creation and deployment service — removing all non-technical components to launch a node.

- Rewards non-mining nodes, encouraging them to run up-to-date software and security to the network. (NUBI);

- Ability to test and generate performance (health) of a node;

- First Decentralized Node Operation Platform "(DNOP)". Node operation platforms have been centralized, subscription-based services with high capital costs to deploy for the protocol. We change that game; and

- NFT mechanics to enhance functionalities, rewards, gamification and

48

more.

271.    Other public statements made by Moss during the KuCoin AMA include, but are not limited to:

- Strongblock's core team comprised of Moss, Abramson, and Michael Mason, Lederer, and Shkut "run[ning] a very lean, focused, and fast development shop, spread all across the globe."

- Strongblock was actively working with groups who want to utilize Strongblock nodes and that fees derived from any such arrangements would be shared by S1 Nodes.

- The decision to incentivize S1 Nodes on the ETH network was made because the Strongblock system is an "amazing, innovative project that **needs** mass adoption. You can get that on Ethereum 1.0, where nearly every DeFi project is."

- Moss and the Strongblock team would "[m]ake the token valuable by creating a great, useful product, and building community trust by continuing to do so" thereby naturally increasing the value of the Strongblock system's native token.

*Strongblock's Communications Through Alternative Social Media Forums*

272.    Defendants frequently communicated with Plaintiffs and the Strongblock community through several separate social media sites, including but not limited to *Medium, Facebook, Telegram, Twitter, and Discord.*

273.    Moss engaged in curated AMA sessions specifically directed at Plaintiffs and the Strongblock community that were published online in written or video form. These AMA sessions were additionally transcribed and published to the Strongblock community through the Strongblock.io community Discord server by an individual with the username of "DXNIEL | Won't DM 1st".

274.    In transcribing and publishing Moss and Strongblock's statements to the Strongblock community, "DXNIEL | Won't DM 1st" had actual or apparent authority to speak on

behalf of MOSS and Strongblock.

275.     Moss' statements from an AMA session were published online and specifically to the Strongblock community by "DXNIEL | Won't DM 1st" on December 13, 2021, and included, *inter alia*:

- The Strongblock community would be given notice of reward reductions to the S1 Nodes as the same would be discussed with the community prior to implementation;

- The long-term plan for Strongblock's native token was for its use as rewards to support blockchain nodes and validators;

- The intended community governance model for Strongblock's native tokens has been built into the smart contract of the tokens since their inception;

- Strongblock was moving toward its community governance model so that STRNG/STRNGR holders could make decisions toward the expansion of the Strongblock ecosystem and what protocols are implemented.

- Strongblock's NaaS and NUBI reward model had been in operation for a year and was more sustained and sustainable than a majority of DeFi protocols.

- Strongblock was working on a "HUGE" project that would allow node-runners and holders to participate toward sustainability while continuing to benefit.

276.     Moss' statements from an AMA session held on January 14, 2022, were published online and specifically to the Strongblock community by "DXNIEL | Won't DM 1st" and included, *inter alia*:

- The Strongblock platform native tokens are designed as governance tokens, and that in 2022 Strongblock will move toward community governance;

- Defendants marketing strategies early on involved utilizing word of mouth by community members, capitalizing on the "network effect from engaged communities" to promulgate information of the NUBI "lifetime" reward system initially advertised by Defendants themselves.

- Over 239,000 nodes had been created within the Strongblock system between

the dates of December 2020 and January 14, 2022;

- Moss and Strongblock's focus for 2022 would be sustainability achieved by way of new protocol introductions and non-STRNG/STRNGR rewards;

- S1 Nodes were not on the tapering model and the tapering of S1 rewards would never go to zero (0).

277.    Moss engaged in another AMA on February 19, 2022, that was published online and specifically to the Strongblock community by "DXNIEL | Won't DM 1st" where MOSS stated, *inter alia*:

- Strongblock was running more transactions per day than most blockchains on the ETH network and generating revenue from the same;

- "I don't have any investors I just have board members and things like that – I don't have the investors to come in, kick me – we have minority shareholders. And so, I get to make a lot of these decisions."

- Moss and Strongblock had "a number of plans" in place "to make sure that everybody keeps getting their rewards"

- 10% of Strongblock's native tokens, used to create nodes, are recycled back into Strongblock's various reward pools with the majority of the tokens going back to the community;

- Moss and Strongblock were actively securing partnerships with other DeFi applications that would bolster the value of Strongblock's native tokens;

- Strongblock did not disclose information about its in-progress developments made and implementations to the Stronblock protocol's sustainability in an effort to not "let the cat out of the bag".

278.    Defendants additionally communicated with the Strongblock community, disseminating Strongblock news and information through an individual identified in the Strongblock discord server as "Saul_StrongblockMarketing".

279.    "Saul_StrongblockMarketing" held meetings with Moss and the Strongblock team for purposes of determining what information would be disseminated to the Strongblock community through "Saul_StrongblockMarketing".

280.     "Saul_StrongblockMarketing" engaged with and communicated with the Strongblock community through dissemination of information and updates related to the Strongblock team's developments, and by clarifying confusion(s) of community members related to information disseminated by "Saul_StrongblockMarketing" himself, or by Moss through AMA sessions posted into the Strongblock discord server by "DXNIEL | Won't DM 1st".

281.     Saul_StrongblockMarketing's statements and representations made to the Strongblock community on behalf of Defendants include *inter alia*:

- Only S2 Ethereum nodes will feature some sort of reward taper model;

- Advising community members to read AMA recaps posted into the discord server by "DXNIEL | Won't DM 1st" prior to making financial decisions related to Strongblock;

- Re-iterating that Moss "has stated all [S1] nodes will never taper unless migrated to S2";

- Separately and recurrently advising that "original [S1] Nodes will NOT be subject to taper unless you voluntarily migrate them to Service 2."

- "We are not worried about being unable to maintain rewards."

- 10% of the Strongblock native token used to create nodes goes back into the rewards, other portions go to exchanges for liquidity, and other portions go toward marketing;

- Changes in rewards would not affect an individual's S1 nodes

- Not all nodes will be on the taper model;

282.     Plaintiffs were advised and informed by Moss, Strongblock, and/or individuals with authority to speak on behalf of the same that the rewards generated by their S1 Nodes would never taper to zero (0).

283.     Plaintiffs were advised and informed by Moss, Strongblock, and/or individuals with authority to speak on behalf of the same that any reduction in rewards generated by S1 Nodes

would be discussed with the Strongblock community first.

284.    Plaintiffs were advised and informed by Moss, Strongblock, and/or individuals with authority to speak on behalf of the same that they would be provided with advanced notice of any reductions made to NUBI rewards.

285.    On May 5, 2022, Plaintiffs were advised and informed by individuals with apparent or actual authority to speak on behalf of Strongblock that "Node Caps w[ould] not be applied to all nodes. Reward caps w[ould] not be unilateral. They will be based on time owned" and that "[e]very node WILL receive its return on [the] token + more".

### D.  Plaintiffs Reasonably Expected To Profit From the Efforts of Defendants

286.    Defendants offered their NaaS protocol and NUBI reward system in an effort to further the "blockchain revolution" and build a profitable decentralized finance enterprise premised on community governance through the use of STRNG and STRNGR tokens. Plaintiffs reasonably believed that if Defendants were successful in doing so, their token purchases required to buy nodes would be a profitable investment given the NUBI rewards generated by the nodes.

287.    At the time the NaaS Protocol launched in in September of 2019, Defendants did not have any product(s) in place, and their proposed software was largely conceptual. Purchasers would have understood that Strongblock was a for-profit entity. Strongblock stated that only portions of proceeds from node creation would be redistributed back into the NUBI reward pool, and that it was building a profitable enterprise by, among other things, partnering with node developers and promoting the creation of its own independent blockchain network, Strongchain. Further, STRONGBLOCK was collecting millions of dollars per month in node maintenance fees alone. Purchasers thus would have understood that Strongblock's success in building and promoting its NaaS protocol, tokens, and the launch of its own independent blockchain would

make their token purchase profitable.

288.     Over the course of the Relevant Period Plaintiffs' expectations were primed by Defendants' marketing of the Strongblock NaaS protocol, tokens, NUBI reward system, and anticipated Strongchain. In the course of marketing Defendants NaaS protocol, Moss touted his experience, expertise, and history within the cryptocurrency, DeFi, and Blockchain spaces in an effort to induce trust and reliance upon his statements and representations as to the sustainability, efficacy, and success of the NaaS protocol and its NUBI reward system.

289.     Despite the volatility of crypto-asset markets, Plaintiffs reasonably expected to profit off of the NUBI rewards, initially transacted for directly with Strongblock, through the creation of S1 Nodes that were represented to be "lifetime" in nature never go to zero. Resultingly, whether the price of the native Strongblock tokens fluctuated positively or negatively, Plaintiffs still reasonably expected to receive daily profits and income in perpetuity.

### E.  Plaintiffs Expected Profits from STRNG, STRNGR, and the S1 Nodes to be Derived from the Managerial Efforts of Strongblock

194.     The inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an Active Participant and are those efforts the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise, as opposed to efforts that are more ministerial in nature.

195.     The more of the following characteristics that are present, the more likely it is that a purchaser of a digital asset is relying on the "efforts of others":

> **a.** An ["Active Participant" or "AP"] is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

1. Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

ii. There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

iii. An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

iv. An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

v. An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

1. Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

2. Determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

3. Determining who will receive additional digital assets and under what conditions.

4. Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

5. Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having

responsibility for the ongoing security of the network.

6. Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

vi. Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

1. The AP has the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

2. The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

3. The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

4. The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

196.    Purchasers of singular function tokens, such as STRNG and STRNGR, and nodes necessarily relied on the managerial efforts of Defendants to realize value from their investments. The success of these managerial efforts in developing the networks on which these tokens operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens. The STRNG and STRNGR tokens were a security at issuance because profits from STRNG and STRNGR would be derived primarily from the managerial efforts of Strongblock in developing the associated network and independent blockchain on which STRNGR would function, rather than having its profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

197.    Plaintiffs' profits in the STRNG and STRNGR tokens, as well as the nodes were to be derived from the managerial efforts of others—specifically Strongblock and its co-founders and development teams.

198.    Indeed, Moss held himself and his team out as an integral part of the success of Strongblock. Moss, Strongblock's CEO, and the other individual Defendants were touted as an "well-known and highly respected" and "pioneer[s] in blockchain infrastructure development." Moss himself touted his own and his teams experience in building and delivering Block.One's EOSIO software. Moss additionally touted his experience in providing strategic consulting and white-paper development for over 36 different blockchains startups with "hundreds of millions successfully raised via ICO's". These statements being made for the purpose of bolstering Moss and Strongblock's credibility and reliability in the public eye.

199.    However complex the resolution of the issue would strike a reasonable investor, STRNG, STRNGR, and the Strongblock nodes satisfy most if not all of the factors relevant to a determination that a digital asset is a security. Strongblock created the STRNG and STRNGR tokens, as well as the nodes from thin air. Strongblock represented that it would develop an ecosystem (i.e., the overall network of individuals using STRNG and STRNGR or participating in the development of its network) that would increase the value of the STRNG and STRNGR tokens. Plaintiffs expected Defendants to provide significant managerial efforts, to develop and improve the Strongblock ecosystem, to develop and sustain a supportive network, and to secure listings at exchanges through which Strongblock tokens could be traded or liquidated. And Strongblock represented that it would provide significant managerial efforts to achieve these objectives and make the issued ERC-20 token a success.

### F.  Plaintiffs Invested Money

200.     By purchasing Strongblock tokens and nodes, Plaintiffs made an investment of money or other valuable consideration. The first prong of the *Howey* test for determining if something being sold is a security is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration.

201.     Plaintiffs invested traditional and digital currencies, such as bitcoin and ether, to purchase the STRNG and STRNGR tokens, which were then used to buy directly from Defendants Strongblock nodes. The STRNG and STRNGR tokens were listed on decentralized finance exchanges, and those cryptocurrency exchanges permitted Plaintiffs to purchase STRNG and STRNGR with bitcoin and ether.

### G.  Plaintiffs Participated in a Common Enterprise

202.     In evaluating digital assets, a "common enterprise" typically exists because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts.

203.     The Strongblock tokens and nodes are no different. Plaintiffs were participants in the Strongblock Protocol and intended to be involved in its governance and the profits of each Plaintiff were intertwined with those of both Strongblock and of other Plaintiffs and investors. Strongblock was responsible for supporting the S1 Nodes, developing partnerships with new node protocols, maintaining the rewards pool for the S1 Nodes, pooled investors' assets, and controlled those assets. Strongblock's team, as stated by Moss himself, also retained significant amounts of the STRNG and STRNGR tokens, thus sharing in the profits and risk of the venture.

### H.  The Subject Update

204.     On May 19, 2022, Defendants made a Subject Update unilaterally, and without

notice, implemented a hard cap on rewards that may be generated by Strongblock S1 Nodes ending NUBI rewards after a node had generated twenty (20) STRNGR cumulatively.

205.    Prior to the Subject Update, Plaintiffs poured millions of dollars into Strongblock, entering into Node Contracts and transacting to build S1 Nodes, under the guise and impression that their S1 Nodes would provide "lifetime" NUBI rewards received *per diem* in the form STRNGR for each created S1 Node.

206.    The May 19, 2022, update to the Strongblock platform vitiated the purpose, function, and value of the S1 Nodes and materially changed the terms and expectations of the Node Contracts that each S1 Node was tied to.

207.    The May 19, 2022, update was implemented while STRNGR was at an approximate value of $15.00 per STRNGR token, down approximately 99% from its October 2021 all-time high of $1,200.00 per token, thereby completely obliterating the Plaintiffs abilities to recover the value of the S1 Node assets and NUBI rewards transacted for directly with Strongblock.

208.    Currently, STRNGR presents with a market value less valuable than the STRNG token, which has no reasonably viable or economic purpose as a result of Strongblock's "upgrade" to STRNGR as its main native token.

209.    The value of Strongblock's native token has dropped over 99% in value from its record high token of approximately $1,200.00 per token which was reached in December of 2021.

210.    The current value of Strongblock's native token renders the non-transferrable S1 Nodes and their NUBI rewards worthless because the monthly maintenance fees due to be paid by Plaintiffs, per node, exceed the amount of NUBI rewards that would be generated by the node.

211.    Plaintiffs are forced to remit monthly maintenance fees of $14.95 to Strongblock

in an effort to solely continue receiving rewards in the form of a devalued coin or otherwise their nodes will be terminated by the Node Contract.

212.    Despite Defendants' representations, Plaintiffs and the Strongblock community were not provided with the opportunity to engage in community governance over the imposition of node caps on S1 Nodes.

213.    Despite Defendants' representations, Plaintiffs and the Strongblock community were never given notice as to the imposition of caps on rewards generated by S1 nodes.

214.    Despite Defendants' representations, S1 Nodes now cease to generate "lifetime" NUBI rewards.

215.    Despite Defendants' representations, reward caps were unilaterally imposed and the imposition of reward caps to the S1 Nodes was not based on time-owned, as the same reward cap was unilaterally applied to all S1 Nodes.

216.    Despite Defendants' representations, Defendants engaged in a course of conduct that vitiated and obliterated the Strongblock community's trust in the Strongblock protocol thereby reducing the value of the Strongblock native tokens.

217.    Defendants' challenged conduct used to lure Plaintiffs into creating S1 Nodes, and theft of monies invested into the Strongblock NaaS project have caused Plaintiffs irreparable harm and substantial monetary damages.

218.    As a direct result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiffs, many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the STRNG and STRNGR tokens, as well as the S1 Nodes—have suffered significant damages in an amount to be proven at trial.

**COUNT I**
**Unregistered Offer and Sale of Securities**
**Section 5 and 12(a)(1) of the Securities Act**
**(Against Defendants by all Plaintiffs)**

219.     Plaintiffs re-allege and incorporate the foregoing allegations as though fully set forth herein.

220.     Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

221.     Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." Id. § 77e(c).

222.     When issued, the Strongblock tokens, including STRNG and STRNGR, and the Strongblock nodes, including the S1 Nodes, were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77(b)(a)(1). Strongblock promoted, solicited or sold STRNG, STRNGR, and S1 Nodes to Plaintiffs either directly through the Strongblock website or indirectly through an intermediary exchange like Uniswap. Strongblock thus directly or indirectly made use

of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

223.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." Id. § 77l(a)(1).

224.    Accordingly, Strongblock has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, id. §§ 77e(a), 77e(c), and 77l(a)(1).

225.    Plaintiffs seek rescissory damages with respect to purchases of STRNG and STRNGR tokens within the last three years and within one year from when an investor could adequately plead that a STRNG or STRNGR token is a security. Id. § 77m.

## COUNT II
### Control Person Liability for Violations of
### Section 5 and 12(a)(1) of the Securities Act
**(Against Moss, Lederer, Abramson, Shkut by all
Plaintiffs)**

226.    Plaintiffs re-allege and re-assert the allegations contained in paragraphs 1-218 as though fully set forth herein.

227.    This Count is asserted against the individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

228.    Each of the individual Defendants, by virtue of their offices, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Strongblock and its employees, and to cause Strongblock to engage in the wrongful conduct complained of herein. Each Individual Defendant had and exercised the power and influence to cause the unlawful offering and sales of Strongblock securities, including STRNG, STRNGR, and the S1 Nodes.

229.    The individual Defendants have the power to direct or cause the direction of the management and policies of Strongblock.

230.    The individual Defendants, separately or together, have sufficient influence to have caused Strongblock to solicit transactions of securities.

231.    The individual Defendants, separately or together, jointly participated in, and/or aided and abetted, Strongblock's solicitation of securities.

232.    By virtue of the conduct alleged herein, the individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs for rescission and/or damages suffered.

### COUNT III
### Breaches of Contract
### (Against Defendants by all Plaintiffs)

233.    Plaintiffs re-allege and reassert the allegations contained in paragraphs 1-218 as though fully set forth herein.

234.    Plaintiffs were required by Defendants to execute a Node Contract when transacting for S1 Nodes directly on the Strongblock App.

235.    Each individual S1 Node is governed by its own Node Contract and Smart Contract on the Strongblock App.

236.    Importantly, each individual Node Contract requires Plaintiffs to remit approximately $14.95, in the form of the Ethereum cryptocurrency ("ETH"), as "maintenance fees" to Strongblock on a monthly basis.

237.    Under each individual Node Contract and Smart Contract applicable to each node held by Plaintiffs, Plaintiffs were entitled to "lifetime" NUBI rewards on a *per diem* basis in the form of STRNG and STRNGR in exchange for keeping their S1 Nodes in compliance via payment of maintenance fees.

238.    On May 19, 2022, Defendants materially breached each individual Node Contract and Smart Contract by unilaterally imposing, without notice, a hard cap — of twenty (20) STRNGR tokens — on the *per diem* rewards to be derived from each individual S1 Node.

239.    The imposition of the hard cap on S1 Node rewards breached the promise of "lifetime" NUBI rewards marketed, advertised, and represented to Plaintiffs when they purchased the nodes from Defendants.

240.    Defendants imposed the hard cap on NUBI rewards generated by S1 Node rewards at a time where the value of the Strongblock native token was approximately $15.00 per token, an almost 99% decrease in value from the Strongblock native token's all-time high of approximately $1,200.00 per token reached in October of 2021.

241.    Defendants imposed the hard cap on S1 Nodes at a time when they knew or should have known the unilateral and surprise imposition of a hard cap on the S1 Node Rewards would cause severe damage to Plaintiffs who had already invested millions into Strongblock.

242.    As a direct and proximate result of Defendants breaches of the Node Contracts and Smart Contracts Plaintiffs have suffered extreme damage in an amount to be determined at trial.

**COUNT IV**
**Conversion**

**(Against Defendants by all Plaintiffs)**

243.    Plaintiffs re-allege and re-assert the allegations contained in paragraphs 1-218 as though fully set forth herein.

244.    Plaintiffs transacted for S1 Nodes directly with Strongblock exchanging ten (10) STRNG or STRNGR tokens for one (1) S1 Node.

245.    At all times material to this action, Plaintiffs controlled, possessed, and had the right to possess each individual S1 Nodes attached to their DeFi Wallet.

246.    At all times material to this action, Plaintiffs additionally had the right to receive *per diem* "lifetime" NUBI rewards generated by their S1 Nodes in the form of STRNG or STRNGR.

247.    On May 19, 2022, Defendants intentionally and unilaterally imposed a hard cap — of twenty (20) STRNGR tokens — on the *per diem* rewards to be derived from each individual S1 Node.

248.    Subsequent to the May 19, 2022 update each S1 Node becomes effectively useless and still non-transferrable once it has generated twenty (20) STRNGR tokens.

249.    Defendants interfered with Plaintiff's control, possession, and use of their S1 Nodes to the exclusion of Plaintiffs rights to receive *per diem* "lifetime" NUBI rewards in the form of STRNG and STRNGR tokens.

250.    As a direct and proximate result of Defendants actions, conduct, and misrepresentations Plaintiffs have suffered extreme damage in an amount to be determined at trial.

**COUNT V**
**Fraudulent Misrepresentation**
**(Against Defendants by all Plaintiffs)**

251.    Plaintiffs re-allege and re-assert the allegations contained in paragraphs 1-218 as

though fully set forth herein.

252.    Defendants marketed, advertised, and disseminated information to the general public — through digital media outlets and social media forums — representing that S1 Nodes came with the promise of "lifetime" NUBI rewards in the form of STRNG and STRNGR tokens distributed to S1 Node holders at a flat rate on a *per diem* basis.

253.    Defendants never advised or informed Plaintiffs that at any moment, without cause, Defendants could unilaterally impose hard caps on S1 Nodes and terminate the flow of NUBI rewards Plaintiffs were receiving from the same.

254.    The above referenced material misrepresentations and omissions of fact were made for the purpose of inducing Plaintiffs to rely upon Defendants representations of "lifetime" NUBI rewards in the form of STRNG and STRNGR tokens generated at a flat rate on a *per diem* basis when transacting for S1 Nodes.

255.    Defendants publicly represented their NaaS program as an effort to support the "blockchain revolution" while "incentivizing node holders" for operating full nodes, and full nodes are vital to the infrastructure of a blockchain network.

256.    Defendants publicly represented that Strongblock, its native ERC-20 Tokens, and its NaaS protocol were purposed for community governance and that Strongblock would move to community governance in the year of 2022.

257.    Moss spoke to his, and the other individual Defendants, career histories and alleged successes in the cryptocurrency space as a means of bolstering Strongblock's credibility.

258.    Moss and Strongblock knew or should have known that their public statements and representations to members of the Strongblock community, including the promise of "lifetime rewards" and Node Universal Basic Income, would be used and/or relied upon by Plaintiffs for the

purpose of transacting directly with Strongblock for S1 Nodes.

259.   Defendants were aware of Plaintiffs, and the Strongblock community's, reliance upon Moss and Strongblock's representations because Moss periodically held curated AMA sessions and engaged with digital media outlets for the purpose of disseminating information related to Strongblock and its Node Universal Basic Income.

260.   Plaintiffs justifiably relied on Defendants material representations, misrepresentations, and omissions of fact in transacting with Strongblock directly for S1 Nodes.

261.   As a direct and proximate result of their reliance upon Defendants material representations, misrepresentations, and omissions of fact, Plaintiffs have suffered extreme damage in an amount to be determined at trial.


**COUNT VI**
**Negligent Misrepresentation**
**(Against Defendants by all Plaintiffs)**

262.   Plaintiffs re-allege and re-assert the allegations contained in paragraphs 1-218 as though fully set forth herein.


263.   Defendants publicly represented their NaaS program as an effort to support the "blockchain revolution" while "incentivizing node holders" for operating full nodes, and full nodes are vital to the infrastructure of a blockchain network.

264.   Moss spoke to his, and the other individual Defendants, career histories and alleged successes in the cryptocurrency space as a means of bolstering Strongblock's credibility.

265.   Moss and Strongblock knew or should have known that their public statements and representations to members of the Strongblock community, including the promise of "lifetime" NUBI rewards, would be used and/or relied upon by Plaintiffs for the purpose of transacting

directly with Strongblock for S1 Nodes.

266.   Defendants were aware of Plaintiffs, and the Strongblock community's, reliance upon Moss and Strongblock's representations because Moss periodically held curated AMA sessions and engaged with digital media outlets for the purpose of disseminating information related to Strongblock and its NUBI rewards.

267.   Defendants represented that the S1 Node rewards would never go to zero.

268.   Defendants never represented to Plaintiffs that at any point, Defendants could unilaterally terminate the flow of rewards derived from Plaintiffs S1 Nodes without notice.

269.   Defendants' material representations regarding S1 Node rewards were either exaggerated or complete misstatements of fact.

270.   Defendants intentionally or negligently omitted material facts regarding the S1 Node Rewards for the purpose of inducing Plaintiffs into transacting directly with Strongblock for S1 Nodes.

271.   Plaintiffs justifiably relied on Defendants material representations, misrepresentations, and omissions of fact in transacting with Strongblock directly for S1 Nodes.

272.   As a direct and proximate result of their reliance upon Defendants material representations, misrepresentations, and omissions of fact, Plaintiffs have suffered extreme damage in an amount to be determined at trial.

## COUNT VII
### Fraudulent Inducement
### (Against Defendants by all Plaintiffs)

273.   Plaintiffs re-allege and re-assert the allegations contained in paragraphs 1-218 as though fully set forth herein.

274.   Plaintiffs transacted directly with Strongblock for S1 Nodes and executed Node

Contracts in furtherance of the same transactions.

275.     Defendants, and Moss specifically, advertised, marketed and disseminated information regarding Strongblock and the S1 Node rewards. Defendants, and Moss specifically, additionally directed and controlled the actions of Strongblock at all times material to this action.

276.     Resultingly, there existed a special or privity-like relationship between Plaintiffs and Defendants imposing a duty on defendants to impart correct information to Plaintiffs regarding the Strongblock platform and the S1 Node NUBI reward system.

277.     Defendants, and Moss specifically, incorrectly or fraudulently represented to Plaintiffs that the rewards to be derived from the S1 Nodes were "lifetime rewards" and that the S1 Node rewards would never go to zero.

278.     Moss and Strongblock knew or should have known that their public statements and representations to members of the Strongblock community, including the promise of "lifetime rewards" and Node Universal Basic Income, would be used and/or relied upon by Plaintiffs for the purpose of transacting directly with Strongblock for S1 Nodes.

279.     Plaintiffs justifiably relied on Defendants material representations, misrepresentations, and omissions of fact in transacting with Strongblock directly for S1 Nodes.

280.     As a direct and proximate result of their reliance upon Defendants material representations, misrepresentations, and omissions of fact, Plaintiffs have suffered extreme damage in an amount to be determined at trial.

### COUNT VIII
### Negligence
### (Against Defendants by all Plaintiffs)

281.     Plaintiffs re-allege and re-assert the allegations contained in paragraphs 1-218 as though fully set forth herein.

282.     Pursuant to the above-described relationship between Plaintiffs and Defendants, Defendants owed Plaintiffs a duty to exercise reasonable care that included a duty to disclose material information regarding cryptocurrency investments, the Strongblock NaaS protocol, the STRNG and STRNGR tokens, as well as the S1 Node rewards.

283.     Defendants breached their duties of care to Plaintiffs

284.     As a direct and proximate result of Defendants' breaches of their duties, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

285.     By reason therefore, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused by their breaches in an amount to be determined at trial.

### COUNT IX
### Unjust Enrichment
### (Against Defendants by all Plaintiffs)

286.     Plaintiffs re-allege and re-assert the allegations contained in paragraphs 1-218 as though fully set forth herein.

287.     Defendants were unjustly enriched at Plaintiffs expense. Specifically, Defendants unilaterally obliterated Plaintiffs "lifetime rewards" derived from their S1 Nodes, transacted for directly with Strongblock, while continuing to collect monthly maintenance fees from Plaintiffs in the amount of approximately $14.95 per each S1 Node held.

288.     Upon information and belief Moss, Lederer, Abramson, and Shkut, directly benefitted from Plaintiffs payment of monthly maintenance fees toward individual S1 Nodes while depriving Plaintiffs of the benefits of their bargains, made directly with Strongblock, for the creation of S1 Nodes.

289.    Upon information and belief as of the date of May 19, 2022, Defendants were collecting approximately Seven Million Dollars ($7,000,000.00) per month in node maintenance fees.

290.    Upon information and belief Defendants diverted the monthly maintenance fees remitted by Plaintiffs to Strongblock, to themselves for their own personal gain.

291.    It is against equity and good conscience to permit Defendants to retain funds they diverted for their own personal use when they made misrepresentations to Plaintiffs regarding the benefits of their bargains for S1 Nodes, the viability of the S1 Node rewards, and the indefinite nature of the S1 Node rewards, which Plaintiffs relied upon in deciding to invest.

292.    As a direct and proximate result of Defendants' wrongful diversion of Plaintiffs' investment funds, Defendants have been unjustly enriched to Plaintiffs detriment.

293.    Accordingly, Plaintiffs are entitled to a judgment in their favor for the full amount by which Defendants have been unjustly enriched, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a judgment awarding Plaintiffs: (1) compensatory damages in an amount no less than $22,323,965.48, plus any interest accrued thereon (including pre-judgement and post-judgment interest), or to be determined at trial; (2) punitive damages in an amount to be determined at trial; and (3) any other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs, respectfully demand a trial by jury for all claims and issues so triable.

## DOCUMENT PRESERVATION DEMAND

Plaintiffs demand that Defendants take affirmative steps to preserve all records, lists,

electronic databases or other itemization of telephone numbers associated with the communications or transmittal of the calls as alleged herein.

Dated: December 23, 2022.                    _/s/ Payton H. Poliakoff_

GOVERNMENT LAW GROUP, PLLC          ZEISLER PLLC
Payton H. Poliakoff (PHV forthcoming)     Daniel B. Ravicher
Museum Plaza Building                     777 Brickell Ave Ste 501
200 S Andrews Avenue, Suite 601           Miami, Fl, 33131
Fort Lauderdale, Florida 33301            Tel.: (917) 843-3425
Tel.: (954) 909-0580                      dan@zeisler-law.com
ppoliakoff@govlawgroup.com
iriera@govlawgroup.com                    _Counsel for Plaintiffs_