## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONALD ABDUA, et al.<br><br>　　　*Plaintiffs*,<br><br>v.<br><br>STRONGBLOCK, et al.,<br><br>　　　*Defendants*. | **Case No. 1:22-cv-10869-LTS-BCM**<br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND COMPEL ARBITRATION

Payton H. Poliakoff (*pro hac vice* admitted)
Daniel B. Ravicher (NY Bar No. 3956000)
ZEISLER PLLC
777 Brickell Ave Ste 501
Miami, FL 33131
(786) 505-1205 / (888) 229-1921 FAX
payton.poliakoff@outlook.com
dan@zeisler-law.com

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................2

    A. The Strongblock Node Purchase Page.........................................................2

    B. Strongblock, Inc.........................................................................................4

ARGUMENT ...................................................................................................................5

    I.     Plaintiffs Did Not Have Notice of or Assent to Any Agreement to Arbitrate.........6

        A. Plaintiffs Did Not Have Notice of the Terms of Service ..................................6

        B. Defendants Have Failed to Show Plaintiffs Assented to the Terms of Service.........................................................................................................9

    II.    The Agreement to Arbitrate Is Unenforceable Because It Prevents Effective Vindication of Plaintiffs' U.S. Securities Act Claims ...........................................10

    III.   Even if this Court Finds a Valid and Existing Agreement to Arbitrate Between the Parties, § 4 of the Federal Arbitration Act Precludes this Court from Compelling Arbitration in a Forum Outside the Southern District of New York……………………………………………………………..14

CONCLUSION...............................................................................................17

i

# TABLE OF AUTHORITIES

*Am. Exp. Co. v Italian Colors Restaurant*
    570 U.S. 228 (2013)..................................................................................................10

*Ansari v. Qwest Commc'ns Corp.*
    414 F.3d 1214 (10th Cir. 2005) ...............................................................................15

*Berkson v. Gogo, LLC*
    97 F. Supp. 3d 359 (E.D.N.Y 2015) ...................................................................6, 7, 9

*Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*
    346 F.3d. 360 (2d Cir. 2003)......................................................................................5

*Celltrace Commc'ns Ltd. v. Acacia Research Corp.*
    15-CV-4746 (AJN), 2016 WL 3407848 (S.D.N.Y. June 16, 2016) ...................................5

*Celltrace Commc'ns Ltd v. Acacia Research Corp.*
    689 F. App'x 6 (2d Cir. 2017) ...................................................................................6

*Dupuy-Busching Gen. Agency, Inc. v. Ambassador Ins. Co.*
    524 F.2d 1275 (5th Cir. 1975) ..................................................................................16

*Duran v. J. Hass Group, L.L.C.*
    531 F. App'x. 146 (2d. Cir. 2013) ..............................................................................6

*Eisen v. Venulum Ltd.*
    244 F. Supp. 3d 324 (W.D.N.Y. 2017) .....................................................................11

*Econo-Car Int'l, Inc. v. Antilles Car Rentals, Inc.*
    499 F.2d 1391 (3d Cir. 1974)....................................................................................15

*Hines v. Overstock.com, Inc.*
    380 F. App'x. 22 (2d Cir. 2010) .................................................................................6

*Inland Bulk Transfer Co. v. Cummins Engine Co.*
    332 F.3d 1007 (6th Cir. 1997) ..................................................................................15

*Jain v. de Mere*
    51 F.3d 686 (7th Cir. 1995) ......................................................................................15

*J.P. Morgan Sec. Inc. v. Louisiana Citizens Prop. Ins. Corp.*
    712 F. Supp. 2d 70 (S.D.N.Y 2010).........................................................................14

*Law Offices of Manson III v. Keiko Aoki*
    No. 19-CV-04392-LTS-GWG, 2020 WL 767466 (S.D.N.Y. Jan. 3, 2020) .....................14

*Meyer v. Uber Techs., Inc.*
    868 F.3d 66 (2d Cir. 2017)................................................................7, 8, 9, 10

*Nguyen v. Barnes & Noble, Inc.*
    763 F.3d 1171 (9th Cir. 2014) ...........................................................................7

*Nicosia v. Amazon.com, Inc.*
    834 F.3d 220 (2d Cir. 2016)..........................................................................5, 6

*Plazza v. AIRBNB, INC.*
    289 F. Supp. 3d 537 (S.D.N.Y. 2018).............................................................8, 9

*Ragone v. Atl. Video at Manhattan Ctr.*
    595 F.3d 115 (2d Cir. 2010)........................................................................5, 12

*Rent-A-Center, West, Inc., v. Jackson*
    561 U.S. 63 (2010).............................................................................................6

*Schnabel v. Trilegiant Corp.*
    697 F.3d 110 (2d Cir. 2012).............................................................................9

*Sea Spray Holdings, Ltd. v. Pali Fin. Grp. Inc.*
    F. Supp. 2d 356 (S.D.N.Y. 2003) ...................................................................14

*Sgouros v. TransUnion Corp.,*
    No. 14-CV-1850, 2015 WL 507584 (N.D. Ill. Feb. 5, 2015) ...........................6

*Specht v. Netscape Commc'ns Corp.*
    150 F. Supp. 2d 585 (S.D.N.Y. 2001).............................................................10

*Starke v. SquareTrade, Inc.*
    913 F.3d 279 (2d Cir. 2019).............................................................................7

*Textile Unlimited, Inc. v. A.BMH Co.*
    240 F. 3d. 781 (9th Cir. 2001) .......................................................................15

## Other Authorities

9 U.S.C. §4 (2022) .....................................................................................................5, 15

## INTRODUCTION

Plaintiffs agree with Defendants that this case is nearly identical to the related case *Crowl, et al., v. StrongBlock, et al.*, Case No. 1:22-cv-07313 ("*Crowl*"). Indeed, Plaintiffs filed a Statement of Relatedness upon filing this case because, "Plaintiffs in both cases make the exact same claims against the exact same defendants based on identical factual allegations except as to their individual losses. The legal and factual issues involved in both cases are and will be the same." Dkt. 10.

Plaintiffs also agree that Defendants' Motion to Dismiss this case is virtually the same as their motion to dismiss *Crowl*, a motion that is fully briefed and pending the Court's ruling. As a result, this brief in opposition to Defendants' motion to dismiss this case is substantially similar to the brief filed in opposition to Defendants' motion to dismiss *Crowl*. However, just as Defendants' motion to dismiss this case is different in some ways from the *Crowl* motion to dismiss, so too is this brief different in some ways from the *Crowl* plaintiffs' brief in opposition to Defendants' motion to dismiss that case.

However, the result in both cases is the same, Defendants' Motion to Dismiss and Compel Arbitration should be denied because Plaintiffs neither had notice of nor assented to any agreement to arbitrate. Regarding notice, the purported agreement to arbitrate is buried in the middle of a Terms of Service ("TOS") that was never presented to Plaintiffs but was instead merely linked to via a dark blue link on a black background at the very bottom of a long list of other unrelated details displayed in highly contrasted white font colors. Regarding assent, contrary to Defendant Moss' initial declaration in *Crowl* that the node purchase page had not changed since January of 2021, Defendants now admit that their node purchase page has changed no less than eleven times in both form and substance. At certain intervals, it did not even require node purchasers to manifest any form of assent to the Terms of Service, but rather merely read them. Defendants have admitted

they do not collect any personal information from purchasers of nodes and, as a result, they cannot directly show that any Plaintiff agreed to arbitrate disputes.

Regardless, the January 16, 2021, TOS' agreement to arbitrate, which applies to all of the Plaintiffs because they all purchased all of their nodes after that date, is unenforceable because its choice of law clause states "the internal laws of the Cayman Islands without regard to choice-of-law rules" apply and that would prevent effective vindication of Plaintiffs' U.S. Securities Act claims given they are not recognized by internal Cayman Islands law.

## BACKGROUND

### A.      The Strongblock Node Purchase Page

Plaintiffs purchased Strongblock nodes from Defendants by visiting the Strongblock website App located at https://app.strongblock.com/, connecting their electronic cryptocurrency wallet, and clicking on the "Create Node" button. Doing this displayed to Plaintiffs a "Create Your Node" page, which Plaintiffs will refer to as the "Node Purchase" page, as it is the page from which the purchase of nodes is completed.

In his declaration supporting Defendants' motion, Mr. Moss admits that the Node Purchase Page, or what he calls the "sign-up flow", has changed substantially on at least 11 separate occasions. Doc. 17-3, pp. 3-17. Relevant here is that Defendants' frequent changes to the "sign-up flow" included: (1) changing the background color on July 30, 2021, from white to black and using a dark blue font for the hyperlink to the TOS that obscured it in contrast to the black background; (2) increasing the quantity of text on "sign-up flow's" page so as to extend its length creating a wall of highly contrasted white text on a dark background and drawing a reader's attention away from the obscured dark blue hyperlink; (3) changing the substance of information contained upon the "sign-up flow" itself so that it, at certain times, did not even require purchasers to agree to the Terms of Service; and, (4) freely interchanging the placements of the hyperlinks to the TOS and

the Node Application Guidelines. *Id.*

Another significant difference between the various "sign-up flows" is that instead of having a single paragraph next to a single check box as shown in early versions of the Node Purchase page, Defendants changed the page to instead have a bulleted list of up to nine separate sentences placed next to the single check box. *Id* at 13 ("Sign-Up Flow 10a: Ethereum Classic – May 19, 2022 – June 22, 2022"). Notably, the checkbox is not placed next to the ninth bullet point containing the language that the user has "read" the Terms of Service. Rather, it is placed next to the middle of the bulleted list between the fourth and fifth bullets. *Id.*

These changes were made without notice to Strongblock users and fatally affect the existence of Plaintiffs notice of the TOS and its contents. Only recently – after the *Crowl* case was filed – have the Defendants changed their "sign-up flow" so as to segregate language related to their "Terms of Service" from all other information contained on the page. *Id.* at 17 ("Sign-Up Flow #11: December 13, 2022 – Present").

All 198 Plaintiffs in this case bought nodes after the July 30, 2021, change from white to black background. Decl. Poliakoff, Ex. A (listing of all Plaintiffs, the number of nodes they purchased, and the first and last dates of purchase). Only two of the 198 Plaintiffs bought any nodes before that date, namely Mr. David Littlechild bought his first node on February 8, 2021, and Geoffrey Alleyne bought his first node on July 29, 2021. However, both Mr. Littlechild and Mr. Alleyne bought nodes long after the July 30, 2021, change in background color, with Mr. Littlechild buying his last node on May 16, 2022, and Mr. Alleyne buying his last node on February 9, 2022. Thus, at the relevant times here, Defendants' "sign-up flow" had a black background that obscured the dark blue hyperlink to the Terms of Service contained therein.

Further, no Plaintiff bought nodes prior to January 16, 2021, and thus the Terms of Service

of that date (Dkt. 17-6) is the only one applicable here. The prior Terms of Service dated December 3, 2020, is not relevant because it was not the operative TOS at any time that any Plaintiff bought any node. Decl. Poliakoff, Ex. A.

**B.      Strongblock, Inc.**

Defendants assert that Plaintiffs have no factual support for their allegation that Strongblock is and at all relevant times was an unincorporated general partnership. However, all three versions of the Terms of Service provided by Defendants with their motion state in their opening sentence that the Strongblock website and app is, "provided by Strongblock, Inc." *See* Dkt. 17-4, p. 2; Dkt. 17-5, p. 2; and, Dkt. 17-6, p.2. Thus, in their own Terms of Service, Defendants represented that they are a corporation named Strongblock, Inc. However, no such corporation has ever existed. Because no "Strongblock, Inc." ever existed, the persons holding themselves out to be such an entity, i.e. the individual defendants here, are instead rightly considered a general partnership doing business under the name "Strongblock, Inc.".

Defendants claim to the Court that the defendant Strongblock is not an unincorporated general partnership, but instead a Cayman Islands company called Jenison Holdings SEZC. While Jenison Holdings is the registrant of a Strongblock trademark, that does not prove it is the operator of the Strongblock website, app, and nodes at issue here. Indeed, in his declaration, Mr. Moss concedes that neither he nor any of the other individual defendants are employed by Jenison Holdings SEZC. Rather, they are "employed by a limited liability company that contracts with Jenison Holdings SEZC." Doc. 17-3. To date, Defendants still conveniently fail to identify the LLC that employs them and operates the Strongblock website, app, and nodes. Defendants also fail to provide any details regarding the contract between the unnamed LLC and Jenison Holdings.

Further, the Directors of Jenison Holdings SEZC according to the Cayman Islands General Registry are individuals named Christopher John Bowring and Sean John Inggs. Decl. Poliakoff,

Ex. B. Neither of these individuals are named defendants here or alleged by Plaintiffs to be involved in any way with the acts involved herein. Further, the Cayman Islands General Registry also identifies the "Nature of Business" of Jenison Holdings SEZC as "Holding company", not as any type of operating company. *Id*.

Regarding Jenison Holding SEZC's Strongblock trademark, it is not registered for use with the sale of nodes as is relevant here. Decl. Poliakoff, Ex. C. Rather, it is registered for goods and services including "computer software," "an online marketplace for selling and trading virtual goods with other users," and "providing temporary use of on-line non-downloadable software for use in the exchange of virtual items." Plaintiffs here did not purchase any such goods or services. Rather, Plaintiffs here purchased nodes. Thus, the trademark is a red herring and does not support Defendants' argument that the "Strongblock, Inc." general partnership is instead Jenison Holdings.

## **ARGUMENT**

There are two issues presented before the Court: (1) whether there is an agreement to arbitrate between the parties, *Cap Gemini Ernst & Young, U.S. L.L.C., v. Nackel*, 346 F. 3d. 360, 365 (2d Cir. 2003); and, (2) if there is, whether that agreement is enforceable. *Ragone v. Atl. Video at Manhattan Ctr*., 595 F. 3d 115, 121, (2d. Cir. 2010) (emphatic application of arbitration agreements does not amount to automatic application).

Where one party argues that there is no valid arbitration agreement, courts have decided the questions of arbitrability. *Celltrace Commc'ns Ltd. v. Acacia Research Corp.,* 15-CV-4746 (AJN), 2016 WL 3407848 (S.D.N.Y. June 16, 2016). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016); *see also* 9 U.S.C. §4. When the movant asserts an intent to arbitrate and there is a dispute as to the relevance, authenticity, or accuracy of the asserted agreement to arbitrate

then the district court may not dismiss the complaint with the same material(s) in mind but instead should hear the request to compel arbitration in a summary judgment fashion and stay the underlying matter in the event arbitration is compelled. *Id.* at 230-31; *see also Celltrace Communications Limited v. Acacia Research Corporation*, 689 F. App'x. 6 (2d Cir. 2017).

Arbitration clauses are matters of contract law and as such "may be invalidated by generally applicable contract defenses." *Rent-A-Center, West, Inc. v. Jackson,* 561 U.S. 63, 67 (2010). "If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement . . ." *Id.* at 71; *see e.g., Duran v. J. Hass Group, L.L.C.,* 531 F. App'x. 146, 147 (2d Cir. 2013).

## I.    Plaintiffs Did Not Have Notice of or Assent to Any Agreement to Arbitrate

### A.    *Plaintiffs Did Not Have Notice of the Terms of Service*

Defendants argue the Node Purchase page provided Plaintiffs with notice of the Terms of Service that contain an agreement to arbitrate.

> While it is true that a party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing, an exception to this general rule exists when the writing does not appear to be a contract and the terms are not called to the attention of the recipient. In such a case no contract is formed with respect to the undisclosed terms.

*Berkson v. Gogo, LLC*, 97 F. Supp. 3d. 359, 394 (E.D.N.Y 2015) (citing *Sgouros v. TransUnion Corp.,* No. 14-CV-1850, 2015 WL 507584, at *5-7 (N.D. Ill. Feb. 5, 2015) (finding an internet agreement invalid because users were not provided with sufficient notice that they were being bound by the terms due to such notice being "amply far" from the text requiring authorization)); *see also Hines v. Overstock.com, Inc.,* 380 F. App'x. 22, 25 (2d Cir. 2010) (asserting use of a website constitutes acceptance of terms and conditions is insufficient in the absence of allegations to establish knowledge of the terms and conditions themselves).

"In the context of web-based contracts, we look to the design and content of the relevant

interface to determine if the contract terms were presented to the offeree in way that would put her on inquiry notice of such terms." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) (citing *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1177 (9th Cir. 2014)). See also *Berkson*, 97 F. Supp. 3d. at 396. The design and content of the Strongblock App webpage fails to provide constructive notice of the Terms of Service for several reasons.

It is undisputed that the Terms of Service containing the agreement to arbitrate were never presented directly to any node purchaser, including Plaintiffs. No purchaser of Strongblock nodes was ever required to scroll down through the Terms of Service in order to ensure they were directly presented on the user's screen. And no purchaser of a Strongblock node prior to December 13, 2022, was ever required to click a box stating "I agree" to just the Terms of Service in and by itself. Dkt. 17-3, p. 17. Only one plaintiff, Stephane Dabadie, purchased nodes after that date, but he first purchased nodes well before then in February 2022. Decl. Poliakoff, Ex. A.

Defendants' only argument regarding adequate notice is that the link to the Terms of Service buried at the bottom of the Node Purchase page and comingled with many other details relating to the node purchase was sufficient notice of the agreement to arbitrate contained within the Terms of Service. This argument fails for several reasons.

First, the placement of the link to the Terms of Service at the very bottom of the Node Purchase page in an undistinguished font size and colored dark blue on a black background renders it inconspicuous to a user.

Second, the link to the Terms of Service is placed directly after another link (to a Node Applications Policy) with identical styling. When terms are not displayed on the page, as is the case here, courts look for "a clear prompt directing users to read [the terms]." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017). Here the Node Applications Policy and Terms of

Service are both identically hyperlinked in inconspicuous ways so that they are obscured and do not clearly prompt any user to read the Terms of Service. The similar coloring and style of the links (dark blue on black background) also makes them appear virtually redacted from the web page itself.

When evaluating the design and content of the webpage assessed in *Plazza*, this court recognized that insufficient notice may be found in circumstances where the hyperlinks are located at the bottom of the page with typeface bearing colors similar to that of the page background and placed next to other hyperlinks. *Plazza v. Airbnb, Inc.,* 289 F. Supp. 3d. 537, 553 (S.D.N.Y 2018). Here, the link to the Terms of Service was not in large font, all caps, or in bold. Instead, the hyperlink was obscured by the coloring of the text as construed against the background of the webpage and placed directly behind a separate hyperlink to the Node Applications Policy.

Defendants asserted similarities with the circumstances in *Meyer* relies on the "bright white background and contrasting hyperlinks" with the hyperlinks being located "directly adjacent to the button to manifest assent as shown in the screenshot provided by Mr. Moss from January 2021. *Def's Mot.* at 15; *see also Meyer, Inc*., 868 F.3d at 78 (2d Cir. 2017). However, Moss' own Declaration shows in July of 2021 Defendants completely changed the content, design, and layout of their website and node purchase page so as to make it completely irreconcilable with the circumstances of *Meyer*. Defendants' node purchase page utilized a black background with dark blue hyperlinks. Moreover, the node purchase page continued to grow in length and size resulting from cluttered additions of large quantities of white brightly contrasted text, all of which stands out against the webpage which further serves to obscure any hyperlinks buried within the page.

At no point was the hyperlink to the terms of service "spatially coupled" in an organized manner and "placed directly below the node name and description fields." Rather, it was always

at the very bottom of list of various bullet points listed in small uncapitalized font displayed in a single-spaced style through highly contrasted font colors that continued to grow in length as a result of Defendant's frequent changes made to the same.

Further, Defendant Moss' own Declaration admits that Defendants have substantively changed the Node Purchase page over time, and the various screenshots provided by Mr. Moss show that Defendants' changes to the Node Purchase page served to increasingly obscure the hyperlinks to its own TOS while also substantially growing the amount of cluttered information on the page displayed in highly contrasted font colors. The only text that was blended into the background of Defendants' Node Purchase page as a result of these changes was the hyperlinks to the TOS and Node Application Guidelines.

B.     *Defendants Have Failed to Show Plaintiffs Assented to the Terms of Service*

Manifestation of assent can only be found through one's actions when the user "knows or has reason to know that the other party may infer from his conduct that he assents." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012). When determining whether the parties have entered into a valid agreement to arbitrate, courts should apply ordinary state-law principles that govern the formation of contracts and evaluate the allegations to determine whether they raise a genuine issue of material fact. *Plazza,* F. Supp. 3d at 547. Relying on a contractual provision before a contract has been found to have been accepted by the parties as binding is unacceptable, as mutual manifestation of assent is the "touchstone" of a binding contract. *Berkson* 97 F.Supp. 3d at 387-88. Where the terms of the contract are offered by one party to another, unequivocal acceptance of the terms by the receiving party is required. *Id.*

Defendants' assertion that this case is similar to the circumstances presented before the *Meyer* court is misplaced because Defendants' Node Purchase page did not require that an individual agree to the Terms of Service prior to creating a node. The "registration flow" in *Meyer*

provided users with notice that creating an Uber account necessitated agreement to the terms of service and privacy policy. *Meyer*, 868 F.3d at 80. Here, the Node Purchase page neither provides nor asserts any meaningful assent to the Terms of Service.

The phrase "I agree to the Terms of Service" has not always appeared on the Node Purchase page. The May 18, 2022, Node Purchase page provided by Defendants themselves is wholly absent of any meaningful expression of Plaintiffs' agreement to the Terms of Service. Dkt. 17-3, p. 13. All that version requires is that a node purchaser agree that they have "read" the Terms of Service. Reading a Terms of Service is not the same as agreeing to it.

Defendants assert Plaintiffs manifested their assent to the agreement to arbitrate contained in the TOS by utilizing the Strongblock Platform to name nodes, describe nodes, and "most importantly, cliked[ed] the digital box expressly agreeing to the Terms of Service." However, unambiguous assent to the terms of an arbitration agreement is necessary in order for this Court to compel arbitration. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017). *See also Specht v. Netscape Commc'ns Corp.,* 150 F. Supp. 2d. 585, 594 (S.D.N.Y 2001) (finding the contractual nature of writing as "not obvious" because the offer did not carry an immediately visible notice of existence of license terms or require unambiguous manifestation of assent to those terms). Here, there was no notice of and thus no possible asset to the agreement to arbitrate provided to Plaintiffs.

## II.   The Agreement to Arbitrate Is Unenforceable Because It Prevents Effective Vindication of Plaintiffs' U.S. Securities Act Claims

In *American Express Co. v Italian Colors Restaurant*, the Supreme Court confirmed the existence of an "effective vindication" exception to the rule that courts must "rigorously enforce" arbitration agreements. 570 U.S. 228, 235, 133 S. Ct. 2304, 2310, 186 L. Ed. 2d 417 (2013). In doing so, the Court explained:

> The "effective vindication" exception to which respondents allude originated as dictum in *Mitsubishi Motors*, where we expressed a willingness to invalidate, on

> "public policy" grounds, arbitration agreements that "operat [e] ... as a prospective waiver of a party's right to pursue statutory remedies." 473 U.S., at 637, n. 19, 105 S.Ct. 3346 (emphasis added). ... [W]e said that "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." ... As we have described, the exception finds its origin in the desire to prevent "prospective waiver of a party's right to pursue statutory remedies," *Mitsubishi Motors*, *supra*, at 637, n. 19, 105 S.Ct. 3346 (emphasis added). That would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights.

*Id*. Even the dissent agreed there is an "effective vindication" exception to enforcing arbitration agreements. 570 U.S. 228 at 242, 133 S. Ct. at 2314 (Kagan, J., with Ginsberg, J. and Breyer, J., dissenting) ("our cases establish this proposition: An arbitration clause will not be enforced if it prevents the effective vindication of federal statutory rights, however it achieves that result").

Here, the January 16, 2021, Terms of Service that applies to all Plaintiffs not only requires disputes be arbitrated by ICC arbitration in the Cayman Islands, it also requires that, "all Disputes are governed by ... the internal laws of the Cayman Islands without regard to choice-of-law rules."

Filed herewith is a declaration of Andrew Johnstone, a Partner in the Cayman Islands office of Harneys. Decl. Poliakoff, Ex. E. Mr. Johnstone is the head of Harneys' Litigation, Insolvency and Restructuring group in the Cayman Islands and has significant arbitration experience, including acting as advocate and counsel in arbitrations conducted under the rules of most leading arbitral bodies, including the ICC. As set forth in Mr. Johnstone's declaration, "Claims for violations of the U.S. Securities Act cannot be vindicated in an ICC arbitration in the Cayman Islands governed by the internal laws of the Cayman Islands without regard to choice-of-law rules." Thus, the "effective vindication" exception to enforcement of arbitration agreements applies in this case.

The same result was reached in a 2017 decision from the Western District of New York with facts virtually identical to this case. *Eisen v. Venulum Ltd.*, 244 F. Supp. 3d 324 (W.D.N.Y.

2017). The court in *Eisen* refused to enforce an arbitration agreement that required ICC arbitration in the British Virgin Islands applying BVI law because doing so would result in the plaintiffs losing the ability to bring U.S. Securities Act claims. The Court explained:

> A court can invalidate an agreement to arbitrate which acts as a "prospective waiver of a party's right to pursue statutory remedies." *Am. Express Co. v. Italian Colors Rest.*, ——— U.S. ———, 133 S.Ct. 2304, 2310, 186 L.Ed.2d 417 (2013) (original emphasis omitted). "[A] federal court will compel arbitration of a statutory claim only if it is clear that the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, such that the statute under which its claims are brought will continue to serve both its remedial and deterrent function." *Ragone*, 595 F.3d at 125 (internal citations omitted); see, e.g., *Am. Express*, 133 S.Ct. at 2310; *Hayes*, 811 F.3d at 674 ("[W]hile the Court has affirmed that the FAA gives parties the freedom to structure arbitration in the way they choose, it has repeatedly cautioned that this freedom does not extend to a substantive waiver of federally protected civil rights in an arbitration agreement.") (internal citation omitted).

*Id.* at 344.

The effective vindication exception invalidates the entire arbitration agreement. *Id.* It does not lead to a segregating of the claims that can not be vindicated from any other claims that might be vindicated through the arbitration. *Id.* Thus, here, the entire agreement to arbitrate is invalid.

In *Crowl*, the Defendants filed a reply brief in support of their motion to dismiss that included the declaration of a Cayman Islands attorney named Mr. Hamid Khanbhai. 1:22-cv-07313, Dkt. 39-2, (Dec. 9, 2022). Based on his opinion, Defendants argued that U.S. Securities Act claims could be effectively vindicated in an arbitration in the Cayman Islands. But Mr. Khanbhai's opinion, and Defendants' arguments based thereon, is flawed and should be disregarded for several reasons.

First, Mr. Khanbhai's opinion is based on his belief that, "The arbitration agreement is separate from the TOS, even if contained within it as a clause. Neither the 'General' or the 'Applicable Law; Jurisdiction' clauses form part of the arbitration agreement. … The parties have not made any express choice in relation to the system of contractual law that is to apply to the

arbitration agreement" *Crowl*, Dkt. 39-2 ("Decl. Khanbhai"), ¶¶ 13-14.

The argument that the arbitration clauses within the TOS are a separate and distinct agreement from the TOS even though they are contained wholly within the TOS is tenuous at best. But, assuming for the moment that Mr. Khanbhai's interpretation is correct, that the arbitration agreement and the TOS are two separate agreements, this makes Plaintiffs' argument above that there was never adequate notice of and assent to the arbitration terms of the TOS even stronger, because there is then no argument whatsoever that any Plaintiff was ever given any notice of the "separate" arbitration agreement or manifested any assent to it. Under Mr. Khanbhai's "separate and independent agreements" theory, the only agreement Plaintiffs ever possibly had notice of and assented to is the TOS, as it is the only agreement identified on, and linked to from, the Node Purchase page. There has never been any mention of any "separate" arbitration agreement on any Node Purchase page ever, and no purchaser of any Strongblock node has ever been asked to click any box accepting any such "separate" arbitration agreement.

Mr. Khanbhai's belief that the two choice of law clauses in the TOS somehow do not apply to the arbitration clause is equally strained. The "Applicable Law; Jurisdiction" section of the TOS expressly states, "all Disputes (as defined below) are governed by and will be construed and enforced in accordance with the internal laws of the Cayman Islands without regard to choice-of-law rules. 'Dispute' is a controversy, disagreement, or claim between the parties with respect to, arising out of, or relating to these Terms in any manner whatsoever, whether in contract or tort, or whether legal or equitable." Dkt. 17-6, p.7. The TOS language is unmistakable, "all Disputes" are to be "governed by … the internal laws of the Cayman Islands without regard to choice-of-law rules." Mr. Khanbhai's argument that the TOS' "Applicable Law; Jurisdiction" clause does not apply to the TOS' "Dispute Resolution – Agreement to Arbitrate" clause is, again, tenuous at best.

Mr. Khanbhai's last basis for arguing that Plaintiffs could effectively vindicate their U.S. Securities Act claims in an arbitration in the Cayman Islands is that, even if the TOS' choice of law clause applied to the arbitration, Section 55 of the Cayman Islands Arbitration Act of 2012 "would override that choice in relation to US Securities Law Claims (if any) and the tribunal would have to determine what law to apply by reference to conflict of laws rules." Decl. Khanbhai, ¶ 17. But Mr. Khanbhai admits that, "I am not aware of any Cayman Islands decision that has considered this statutory provision." Decl. Khanbhai, ¶ 31. Thus, Mr. Khanbhai admits that his speculative opinion that an arbitrator in the Cayman Islands would refuse to follow the express choice of law language in the same TOS that contains the arbitration clause is not based on any precedent.

Finally, Mr. Khanbhai argues that even if U.S. Securities Act claims could not be vindicated in a Cayman Islands arbitration under the TOS, there are "materially similar" remedies including deceit, misrepresentation, and misstatement. But none of those are strict liability offenses like U.S. Securities Act claims. Rather, each of those remedies requires proof of something being done that was untruthful, a requirement not necessary to satisfy a U.S. Securities Act claim.

For all these reasons, Mr. Khanbhai's opinion that plaintiffs in *Crowl* (and thus also the Plaintiffs here) could effectively vindicate their U.S. Securities Act claims in a Cayman Islands arbitration under the terms of the Jan 16, 2021, TOS should be disregarded.

## III. Even if this Court Finds a Valid and Existing Agreement to Arbitrate Between the Parties, § 4 of the Federal Arbitration Act Precludes this Court from Compelling Arbitration in a Forum Outside the Southern District of New York

The Southern District of New York has thus far largely held that Section 4 of the Federal Arbitration Act precludes a district court from compelling arbitration where the proceeding is set to take place outside of the district. See, e.g., Law Offices of Manson III v. Keiko Aoki, No. 19-CV-04392-LTS-GWG, 2020 WL 767466 (S.D.N.Y. Jan. 3, 2020); *J.P. Morgan Sec. Inc. v. Louisiana Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d 70, 82-83 (S.D.N.Y 2010); *Sea Spray*

14

*Holdings, Ltd. v. Pali Fin. Grp., Inc.*, F. Supp. 2d 356, 363-64 (S.D.N.Y. 2003). In each of these cases, this court held that where an arbitration agreement designates a specific forum, only a district court within that forum may compel arbitration.

While the Second Circuit has not definitively ruled on this issue, this Court's precedent aligns with the result arrived at by the majority of Circuit Courts that have examined it. In *Jain v. de Mere*, the Seventh Circuit held that a plain reading of Section 4 limits courts to compelling arbitration within the district for which they have subject matter jurisdiction. 51 F.3d 686, 690-91 (7th Cir.) *cert. denied* 516 U.S. 914, 116 S. Ct. 300 (1995) (noting that "a district court compelling arbitration under § 4 lacks the power to order arbitration to proceed outside its district").  Similarly, in *Ansari v. Qwest Commc'ns Corp.*, the Tenth Circuit followed the "correct approach" taken by a "majority of courts", holding that "where parties agree[] to arbitrate in a particular forum only a district court in that forum has authority to compel arbitration under §4**."** 414 F.3d 1214, 1219 (10th Cir. 2005). In making its ruling, the Tenth Circuit rejected the defendant's reliance upon the Ninth Circuit's holding in *Textile Unlimited, Inc. v. A.BMH Co.*, (holding that §§ 9-11 of the FAA do not require venue to be within the contractually designated locale), 240 F. 3d. 781, 783 (9th Cir. 2001), explaining that such an approach would fail to recognize the difference between Sections 4 and 9-11 of the FAA and noting that Section 4 of the FAA is "narrowly tailored" to embrace actions to compel arbitration. 414 F.3d at 1219. Section 4 of the FAA explicitly provides that courts "shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* Section 4 of the FAA further provides "[t]he hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed." *Id.* at 1218-19; 9 U.S.C. § 4.

The Third and Sixth Circuits have likewise subscribed to this view. *See Econo-Car Int'l,*

*Inc. v. Antilles Car Rentals, Inc.*, 499 F.2d 1391, 1394 (3d Cir. 1974); *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1018 (6th Cir. 1997).

The *Ansari* court went a step further and rendered a *sua sponte* analysis of the Fifth Circuit's holding in *Dupuy-Busching Gen. Agency, Inc. v. Ambassador Ins. Co.*, rejecting its holding as unsupported by statutory language. *Id.* at 1218. In *Dupuy-Busching Gen. Agency*, the Fifth Circuit had held that a district court may compel arbitration in the district specified in the arbitration agreement, even if outside its own district, because the Plaintiff filed suit in Mississippi and outside the contract forum of New Jersey with the specific intent of avoiding arbitration. 524 F.2d 1275, 1276, 1278 (5th Cir. 1975).

By seeking an Order compelling Plaintiffs to arbitrate in the Cayman Islands, Defendants are in effect asking the Court to act outside its powers under the Federal Arbitration Act and overturn its own precedent. The applicable arbitration clause here provides in pertinent part:

> Any arbitration between you and StrongBlock will be administered at the International Chamber of Commerce ("ICC") International Court of Arbitration under the Rules of Arbitration of the ICC then in force (the "ICC Rules"), as modified by this Arbitration Agreement, or, if ICC no longer exists or is unable to participate, such other arbitration forum selected by StrongBlock [ . . . ] Absent a contrary decision of the arbitrator or otherwise required by applicable law, the parties agree that *the seat and venue of the arbitration is the Cayman Islands*. The language of the arbitration will be English. The arbitration will be conducted before one commercial arbitrator from the International Chamber of Commerce ("ICC") with substantial experience in resolving commercial contract disputes. As modified by these Terms, and unless otherwise agreed upon by the parties in writing, the arbitration will be governed by the ICC's Arbitration Rules including its Expedited Procedure Provisions (collectively, the "Rules and Procedures"). The ICC Emergency Arbitrator Provisions shall not apply.

Doc. 17-3, p. 20-24 (emphasis added).

It is undisputed that Defendants unilaterally drafted the January 16, 2021, Terms of Service applicable to all Plaintiffs, including the arbitration clause contained therein. Those terms clearly show that Defendants contemplated and intended to conduct arbitration proceedings outside of

the Southern District of New York and the protections afforded by United States laws. There exists a *bona fide* dispute as to the validity and formation of the agreement to arbitrate, and this Court along with the majority of United States Circuit Courts have ruled that compelling arbitration in a situation such as this would conflict with the plain language of the Federal Arbitration Act. This is yet another reason why the Court should deny Defendants' Motion.

## **<u>CONCLUSION</u>**

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss and Compel Arbitration.

Respectfully submitted,

April 10, 2023

*/s/ Payton H. Poliakoff*
Payton H. Poliakoff (*pro hac vice* admitted)
Daniel B. Ravicher (NY Bar No. 3956000)
ZEISLER PLLC
777 Brickell Ave Ste 501
Miami, FL 33131
(786) 505-1205 / (888) 229-1921 FAX
payton.poliakoff@outlook.com
dan@zeisler-law.com

*Counsel for Plaintiffs*
