UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Donald Abuda, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>STRONGBLOCK, et al.<br><br>        Defendants. | Case No. 1:22-cv-10869<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND COMPEL ARBITRATION** |

Dated: April 27, 2023

Respectfully submitted,

LATHROP GPM LLP

/s/ *Michael J. Abrams*
Nancy Sher Cohen (NY Bar No. 4160479)
2049 Century Park East, Suite 3500S
Los Angeles, California 90067
(310) 789-4600 / (310) 789-4601 FAX
Nancy.Cohen@LathropGPM.com

and

Michael J. Abrams (*pro hac vice admitted*)
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
(816) 292-2000 / (816) 292-2001 FAX
Michael.Abrams@LathropGPM.com

ATTORNEYS FOR DEFENDANTS

61701448v3

## **TABLE OF CONTENTS**

                                                                                         **Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT .......................................................................................................................... 1

        A.        Plaintiffs Agreed to Arbitrate their Disputes When They Signed Up After January 16, 2021 to Participate in StrongBlock's Nodes-as-a-Service. ................. 1

        B.        Plaintiffs Are Bound by their Agreement to Arbitrate Disputes Against Jenison Holdings SEZC d/b/a "StrongBlock". ........................................................ 2

        C.        StrongBlock Provided Reasonable Notice of the Terms of Service and the Arbitration Agreement. ............................................................................................ 4

        D.        Plaintiffs Manifested their Assent to the Terms of Service. .................................... 7

        E.        The Parties' Arbitration Agreement Does Not Prevent "Effective Vindication" of Plaintiffs' Claims. ....................................................................... 10

        F.        StrongBlock Seeks a Dismissal of Plaintiffs' Claims or, in the Alternative, a Stay Pending Arbitration. ................................................................................... 13

CONCLUSION ..................................................................................................................... 14

61701448v4

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bancol Y CIA. S. En C. v. Bancolombia S.A.*,
   No. 99 CIV. 2216 (JSR), 2007 WL 640654 (S.D.N.Y. Mar. 1, 2007),
   *aff'd,* 280 F. App'x 85 (2d Cir. 2008) ...............................................................................12

*Berkson v. Gogo, LLC*,
   97 F. Supp. 3d. 359 (E.D.N.Y 2015) ....................................................................................6

*Feld v. Postmates, Inc.*,
   442 F. Supp. 3d 825 (S.D.N.Y. 2020).........................................................................4, 6, 10

*Flores v. Chime Fin., Inc.*,
   No. 21-CV-4735 (RA), 2022 WL 873252 (S.D.N.Y. Mar. 23, 2022)..................................4, 6

*Fteja v. Facebook*,
   841 F. Supp. 2d 829 (S.D.N.Y. 2012)................................................................................4, 6

*Golub Cap. LLC v. NB Alternatives Advisers LLC*,
   No. 21-CV-3991 (LJL), 2022 WL 540653 (S.D.N.Y. Feb. 22, 2022)......................................3

*Green Tree Fin. Corp.-Alabama v. Randolph*,
   531 U.S. 79 (2000)................................................................................................................11

*Hines v. Overstock.com, Inc.*,
   380 F. App'x. 22 (2d Cir. 2010) ............................................................................................6

*J.P. Morgan Sec. Inc. v. Louisiana Citizens Prop. Ins. Corp.*,
   712 F. Supp. 2d 70 (S.D.N.Y. 2010)....................................................................................14

*L. Offs. of Joseph L. Manson III v. Keiko Aoki*,
   No. 19-CV-04392-LTS-GWG, 2020 WL 767466 (S.D.N.Y. Jan. 3, 2020) ...........................14

*Man Diesel A/S v. Seahawk N. Am. LLC*,
   No. 09 CV 0687(HB), 2009 WL 3030220 (S.D.N.Y. Sept. 22, 2009) .....................................3

*Meyer v. Uber Techs., Inc.*,
   868 F.3d 66 (2d Cir. 2017)........................................................................................ *passim*

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010).....................................................10

*Oberstein v. Live Nation Ent., Inc.*,
   No. CV 20-3888-GW-GJSX, 2021 WL 4772885 (C.D. Cal. Sept. 20, 2021),
   *aff'd,* No. 21-56200, 2023 WL 1954688 (9th Cir. Feb. 13, 2023) ...........................................4

Case 1:22-cv-10869-LTS-BCM   Document 32   Filed 04/27/23   Page 4 of 18

*Pagaduan v. Carnival Corp.*,
  No. 15-CV-449 (CBA) (LB), 2019 WL 13223715 (E.D.N.Y. Sept. 20, 2019),
  *aff'd,* 830 F. App'x 61 (2d Cir. 2020) ......................................................................................11

*Phillips v. Audio Active Ltd.*,
  494 F.3d 378 (2d Cir. 2007) ....................................................................................................12

*Plazza v. Airbnb, Inc.*,
  289 F. Supp. 3d. 537 (S.D.N.Y 2018) .......................................................................................7

*Register.com Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d. Cir. 2004) .....................................................................................................9

*Roby v. Corp. of Lloyd's*,
  996 F.2d 1353 (2d Cir. 1993) ..................................................................................................12

*Schnabel v. Trilegiant Corp.*
  697 F.3d 110 (2d Cir. 2012) ......................................................................................................9

*Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*,
  269 F. Supp. 2d 356 (S.D.N.Y. 2003) .....................................................................................14

*Starke v. Gilt Groupe, Inc.*,
  No. 13-CV-5497, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ..........................................4, 6

*Starke v. SquareTrade, Inc.*,
  913 F.3d 279 (2d Cir. 2019) ..................................................................................................6, 7

*Thorne v. Square, Inc.*,
  No. 20CV5119NGGTAM, 2022 WL 542383 (E.D.N.Y. Feb. 23, 2022),
  *appeal withdrawn*, No. 22-542, 2022 WL 2068771 (2d Cir. Apr. 14, 2022) .......................4, 6

*Williams v. Block one*,
  No. 20-CV-2809 (LAK), 2022 WL 5294189 (S.D.N.Y. Aug. 15, 2022) ................................11

**Other Authorities**

Restatement (Third) of Agency
  § 1.04(2)(a) ................................................................................................................................3

**INTRODUCTION**

The Court should dismiss this case and compel arbitration because Plaintiffs' claims fall within the scope of the parties' binding and enforceable arbitration agreement. Plaintiffs seek to avoid dismissal by attempting to create confusion and misdirection. However, once the distractions are cleared away, the Court will see (1) StrongBlock's online sign-up flows provided adequate notice of StrongBlock's Terms of Service ("TOS") and arbitration agreement; (2) Plaintiffs manifested their assent to the TOS and the arbitration agreement by actively clicking a box to acknowledge the notice language; (3) the rare "effective vindication" exception does not apply here; and (4) the Court may appropriately dismiss or stay this litigation pending arbitration in the Cayman Islands.

**ARGUMENT**

Plaintiffs' Opposition utilizes the well-known and seldom successful approach of throwing everything up against the wall to see what sticks. Before turning to the key legal issues in this matter (*i.e.*, Plaintiffs' notice and assent to the TOS and arbitration agreement), we first address the minor issues Plaintiffs employed to create confusion.

**A.    Plaintiffs Agreed to Arbitrate their Disputes When They Signed Up After January 16, 2021 to Participate in StrongBlock's Nodes-as-a-Service.**

The Court will notice that the parties use different terminology to describe the same transactions, namely, Plaintiffs' participation in StrongBlock's Nodes-as-a-Service ("NaaS"). Defendants' Motion to Dismiss accurately describes the process whereby StrongBlock users signed up for NaaS, support the blockchain's nodes, pay fees in crypto tokens, and receive rewards. Plaintiffs—who strive to shoehorn their allegations into a Securities Act claim—state that they "purchased" nodes, and that "all [Plaintiffs] purchased all of their nodes after" January 16, 2021. Doc. 23., at p. 6. However, Plaintiffs do not allege (and cannot allege in good faith) that their

1

alleged "purchase" transferred title, possession, or control of StrongBlock's nodes to Plaintiffs. StrongBlock maintains control and possession of its nodes, and the nodes physically remain in Singapore. Indeed, StrongBlock users (including Plaintiffs) had no control or possession of the nodes at any time. For the sake of accuracy, this Reply Brief refers to the alleged "purchase" of nodes as Plaintiffs' participation in or sign-up for NaaS.

Regardless of the terminology, January 16, 2021 is an important date because this means the Court need not consider the December 3, 2020 Arbitration Agreement (*see* Doc. 17, p. 13), because all Plaintiffs participated in NaaS after the January 15, 2021 Arbitration Agreement took effect. *See id.* at p. 17. Additionally, the Court need not review the StrongBlock sign-up flows before January 16, 2021, which are described on David Moss's Declaration, at ¶¶ 26-28. In sum, all the 198 Plaintiffs signed up for StrongBlock NaaS after StrongBlock adopted the January 16, 2021 Arbitration Agreement and after StrongBlock sign-up flows required users to check a digital box acknowledging StrongBlock's TOS before proceeding further with the NaaS sign-up process.

**B.     Plaintiffs Are Bound by their Agreement to Arbitrate Disputes Against Jenison Holdings SEZC d/b/a "StrongBlock".**

Like many companies, Jenison Holdings SEZC operates under a registered tradename, "StrongBlock", which is fully disclosed on StrongBlock's website and TOS. The first page of the TOS clearly states:

> **Terms of Use**
>
> StrongBlock ("StrongBlock", "we", "us" or "our") provides its Site, products, and services (collectively, "the Service") to you, subject to the following terms of use ("Terms" or "this Agreement").

*See* Doc. 17-6, p. 2. The TOS also discloses, "Effective October 31, 2018, StrongBlock became a tradename of Jenison Holdings SEZC." *Id.* And the final paragraph of the TOS states:

> If you have any concern, question or complaint regarding this Agreement, please contact StrongBlock at StrongBlock, Strathvale House, 90 North Church Street,

George Town, Grand Cayman, KY1-1106, Cayman Islands.  **StrongBlock is a tradename of Jenison Holdings SEZC**.  Email: info@strongblock.io.

*Id.* at p. 8 (emphasis added).  Plaintiffs attempt to sidestep StrongBlock's TOS by alleging that the Individual Defendants are "individual partners in StrongBlock," which Plaintiffs claim without any factual support, is an "unincorporated general partnership."  Doc. 1, at ¶ 1.  Additionally, grasping at straws, Plaintiffs point to the one typographical error where Jenison Holdings' tradename appears as "StrongBlock, Inc." an entity that does not exist, rather than "StrongBlock," and also quibble about the stated purpose for the registered trademark.  *See* Doc. 24, pp. 4-5.  Plaintiffs fail to provide any legal authority suggesting that a typographical error in a tradename is sufficient to disregard a written contract that, in other places in the same agreement, fully discloses the identity and mailing address of the contracting party.  Plaintiffs also fail to show how the description of goods and services in StrongBlock's trademark application has any bearing on whether Plaintiffs were on notice of a disclosed principal.

In any event, Plaintiffs' arguments are directly contrary to New York law.  A principal is disclosed if, at the time an agent and a third party enter the contract, "the third party has notice that the agent is acting for a principal and has notice of the principal's identity."  *Man Diesel A/S v. Seahawk N. Am. LLC*, No. 09 CV 0687(HB), 2009 WL 3030220, at *2 (S.D.N.Y. Sept. 22, 2009) (quoting Restatement (Third) of Agency § 1.04(2)(a)).  Additionally, the use of a trade name is sufficient to put a party on notice of a disclosed principal.  *See, e.g.*, *Golub Cap. LLC v. NB Alternatives Advisers LLC,* No. 21-CV-3991 (LJL), 2022 WL 540653, at *11 (S.D.N.Y. Feb. 22, 2022) (rejecting the argument that a party was not covered by a contract that only referenced the party's tradename, because "[w]here the parties use an abbreviation or shorthand, the answer is not to ignore the parties' intent.").  Moreover, a company's terms of service need not identify the contracting corporate entity so long as "users could have reasonably identified the parties of the

3

[terms of service] as the primary entities for [the companies] based on the [terms] and the surrounding information." *See Oberstein v. Live Nation Ent., Inc.*, No. CV 20-3888-GW-GJSX, 2021 WL 4772885 at *3 (C.D. Cal. Sept. 20, 2021), *aff'd,* No. 21-56200, 2023 WL 1954688 (9th Cir. Feb. 13, 2023). The Court should summarily reject these misdirected arguments.

### C. StrongBlock Provided Reasonable Notice of the Terms of Service and the Arbitration Agreement.

The Court should grant a motion to compel arbitration "where the notice of the arbitration provision [is] reasonably conspicuous and manifestation of assent [is] unambiguous." *See Meyer v. Uber Techs., Inc*., 868 F.3d 66, 76 (2d Cir. 2017). In the context of online transactions, the notice of the arbitration provision is conspicuous, and the manifestation of assent is unambiguous when the terms of service containing an arbitration agreement appear in contrasting font, in close proximity to where the online user confirms his agreement. *See, e.g., Feld v. Postmates, Inc*., 442 F. Supp. 3d 825, 831 (S.D.N.Y. 2020); *Flores v. Chime Fin., Inc*., No. 21-CV-4735 (RA), 2022 WL 873252, at *5 (S.D.N.Y. Mar. 23, 2022); *Thorne v. Square, Inc*., No. 20CV5119NGGTAM, 2022 WL 542383, at *3 (E.D.N.Y. Feb. 23, 2022), appeal withdrawn, No. 22-542, 2022 WL 2068771 (2d Cir. Apr. 14, 2022); *Starke v. Gilt Groupe, Inc*., No. 13-CV-5497, 2014 WL 1652225, at *1 (S.D.N.Y. Apr. 24, 2014); *Fteja v. Facebook*, 841 F. Supp. 2d 829, 834, 841 (S.D.N.Y. 2012). For the Court's convenience, we respectfully provide a compilation of the online sign-up flows considered by the District Court in some of these cases. *See* **Exhibit A** (Declaration of Michael Abrams, attaching documents publicly accessible from PACER).

Like these cases, all of the StrongBlock sign-up flows contained a link to the arbitration agreement in contrasting font and in close proximity to where the StrongBlock users confirmed their agreement. Notably, unlike many of these other sign-up flows approved in this District, StrongBlock's sign-up flow requires users to affirmatively check a digital box before proceeding

4

with a "Submit", "Approve", or "Create" button.  In effect, StrongBlock's sign-up flows require a second level of notice to the TOS.

Plaintiffs' Opposition makes a variety of complaints as to the StrongBlock online sign-up process, claiming that StrongBlock's sign-up flows did not provide adequate notice to the TOS containing the arbitration agreement.  StrongBlock supplied the Court with two lengthy Declarations with screenshots of each sign-up flow StrongBlock used from December 2020 through the present.  *See* Doc. 17-3, at ¶¶ 26-39; *see also* Doc. 39-1 in *Crowl* (Supplemental Declaration of David Moss, at ¶¶ 5-13) (Describing how the blue font used for the TOS hyperlink is the same blue font used for other key features of the StrongBlock site, including the link to pay NaaS fees and claim rewards.); *id.* at ¶ 14 ("Since the introduction of the default Midnight Blue Sign-Up flow on July 30, 2021, NaaS users have had the option of switching between Midnight Blue and White color themes by clicking the sun or moon graphic in the upper right-hand corner of the Sign-Up and My Nodes screens; this is a common feature of many websites.")

Pictures are worth a thousand words.  Plaintiffs' Opposition contains more than a thousand words describing these pictures and, notably, these descriptions are either inaccurate or misleading. We respectfully ask the Court to review the screenshots of StrongBlock's sign-up flows (*see* Doc. 17-3, ¶¶ 26-39), disregard Plaintiffs' mischaracterizations of the same, and analyze StrongBlock's sign-up flows in context with the ones previously approved in this District (*see* **Exhibit A-1**).

The Court will see that the design and content of the StrongBlock sign-up flow interface provides StrongBlock users with a clear prompt directing them to read the TOS.  In each sign-up flow, the hyperlink to StrongBlock's TOS is conspicuously featured in a different color and placed in close proximity to the box next to notice language.  In all instances, significantly, StrongBlock's sign-up flows satisfy the standards for enforceability of web-based contracts set forth in *Meyer v.*

5

*Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017) and applied in *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825 (S.D.N.Y. 2020), *Flores v. Chime Fin., Inc.*, No. 21-CV-4735 (RA), 2022 WL 873252 (S.D.N.Y. Mar. 23, 2022), *Thorne v. Square, Inc.*, No. 20CV5119NGGTAM, 2022 WL 542383 (E.D.N.Y. Feb. 23, 2022); see also *Starke v. Gilt Groupe, Inc.*, No. 13-CV-5497, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) (cited favorably by *Mayer*), and *Fteja v. Facebook*, 841 F. Supp. 2d 829, 834, 841 (S.D.N.Y. 2012) (cited favorably by *Mayer*).

Plaintiffs' arguments sidestep controlling and persuasive case law. Indeed, none of Plaintiffs' criticisms of StrongBlock's sign-up flows align with the current standards articulated by the Second Circuit or a District Court in New York. For example, Plaintiffs complain that no one "was ever required to scroll down through the Terms of Service in order to ensure they were directly presented on the user's screen," and yet fail to mention that such a requirement did not survive *Meyer*. *See* Doc. 24, p. 7; *Meyer*, 868 F.3d at 79 ("Although the contract terms are lengthy and must be reached by a hyperlink, the instructions are clear and reasonably conspicuous."). For another example, without citing to any legal requirement, Plaintiffs complain that no one "was ever required to click a box stating, "I agree" to just the Terms of Service in and by itself." *Id.*; *Meyer*, 868 F.3d at 79 (rejecting argument that users must click a button or box that say "I agree" to the terms of service).

Plaintiffs' reliance on *Hines v. Overstock.com, Inc.*, 380 F. App'x. 22, 25 (2d Cir. 2010) and *Berkson v. Gogo, LLC*, 97 F. Supp. 3d. 359, 394 (E.D.N.Y 2015), which were both decided pre-*Meyer*, is misplaced. The *Meyer* court specifically acknowledged that hyperlinks to the terms of services were acceptable, and it was not necessary for a "scrollwrap" agreement to bind parties to an arbitration provision. Plaintiffs cite to only two post-*Meyer* cases and these are easily distinguishable. First, Plaintiffs cite to *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir.

6

2019), and we respectfully provide a screenshot of this sign-up available from PACER. *See* **Exhibit A-2.** In this instance, the "email in no way signals to Starke that he should click on the link, and it does not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking that link." *Starke* v., 913 F.3d at 293. Plaintiffs also rely on *Plazza v. Airbnb, Inc*., 289 F. Supp. 3d. 537, 553 (S.D.N.Y 2018), which incidentally supports StrongBlock's arguments and not Plaintiffs'. Indeed, the court held that users had inquiry notice of arbitration provision and assented to its terms through conduct that a reasonable person would understand constituted assent. For the Court's convenience, we respectfully provide a screenshot of this sign-up available from PACER. *See* **Exhibit A-3**.

In sum, Plaintiffs' arguments as to the "notice" requirement are based on inaccurate descriptions of StrongBlock's sign-up flows and pre-*Meyer* district court opinions that are inconsistent with *Meyer*'s articulated standards for online arbitration agreements.

        **D.**        **Plaintiffs Manifested their Assent to the Terms of Service.**

All sign-up flows used by StrongBlock during the relevant timeframe featured the phrase "I also agree to the Node Applications Policy and the Terms of Service," or "I have read the Node Applications Policy and the Terms of Service", (or a minor various thereof[1]) prompting Plaintiffs to read the hyperlinked the Terms of Service contractual provisions. Doc. 17-3, at ¶ 41. Without

---

[1] From January 16, 2021 through May 18, 2022, the notice language read "I also agree to the Node Application Policy and the Terms of Service." (Doc. 17-3, pp. 7-13). From May 19, 2022 through June 22, 2022, the notice language for one specific NaaS type stated, "I understand and agree that: . . . I have read the Node Applications Policy and the Terms of Service." (*Id.* at p. 13). All other NaaS types had the "I also agree to" wording. After this five-week period, from June 23, 2022 through December 12, 2022, the notice language for all NaaS types again read: "I also agree to the Node Applications Policy and the Terms of Service." *Id.* at pp. 15-16. Thereafter, the notice language reads "I agree to the Terms of Service and the Nodes Application Policy." *Id.* at pp. 17-18. Plaintiffs attempt to emphasize these very minor changes to no avail.

7

affirmatively checking the digital box, a StrongBlock user could not sign up for NaaS, and an entry would not have been created on the blockchain ledger. *See id.* at ¶ 24

None of the sign-up flows required Plaintiffs to scroll down the screen to see the notice language at the time they signed up for NaaS. Doc. 17-3, at ¶ 40.  The notice language was always temporarily and spatially coupled, placed directly below the node name and description fields and contained the phrase "I also agree to the Node Applications Policy and the Terms of Service," or "I have read the Node Applications Policy and the Terms of Service" prompting Plaintiffs to read the hyperlinked Node Applications Policy and the Terms of Service contractual provisions, regardless of the format of the sign-up flow. *Id.* at ¶ 41.  From December 29, 2020 onward, it was impossible for Plaintiffs to sign up for NaaS without affirmatively checking the digital box on the sign-up flow to indicate an agreement to StrongBlock's Terms of Service. *Id.* at ¶ 24.

StrongBlock's sign-up flows varied slightly over time, as did the verbiage on the button users clicked to confirm their decision to signup for NaaS.  *See* Doc. 17-3, ¶¶ 29 - 39.[2]   NaaS Sign-Up Flow #4, used between December 29, 2020 through February 24, 2021, was the first sign-up flow Plaintiffs allege to have encountered.  Doc. 24, at p. 9 ("no Plaintiff bought nodes prior to January 16, 2021").  This sign-up flow required StrongBlock users to click a digital box next to the "I agree" language, and directly below this prompt, users were also required to click a blue digital button labeled "Submit."  *See* Doc. 17-3, at ¶ 29. Sign-Up Flows #5 through #8 followed

---

[2] Plaintiffs curiously argue that these changes to the NaaS sign-up flow "were made without notice to Strongblock users and fatally affect the existence of Plaintiffs' notice of the TOS and its contents." Doc. 24, p. 7. This type of argument only makes sense in the context of changes to the terms of service, not a sign-up interface. A party's pre-existing assent to be bound by an arbitration agreement cannot be invalidated by a future sign-up flow for the same services, which Plaintiffs may or may not have encountered to sign up for additional NaaS. Significantly, the relevant January 16, 2021 Arbitration Agreement has remained unchanged in all relevant versions of StrongBlock's TOS applicable to Plaintiffs' claims.

this same format, and Sign-Up Flows #9 through #11 similarly placed the buttons directly below the notice language and the box, and instead labeled the buttons "Approve" or "Create." *Id.* at ¶¶ 30-39. In all instances, once again, StrongBlock users could not approve their NaaS sign-up without clicking the digital box next to the "I agree" language and also clicking the button directly below, labeled "Submit," "Approve", or "Create"—all of which indicate assent to the TOS; *see Meyer*, 868 F.3d at 80 (2d Cir. 2017) (online user "unambiguously manifested his assent to Uber's Terms of Service by clicking the "Register" button).

Plaintiffs point to one iteration of the StrongBlock sign-up flow, which was used for only five weeks in the spring of 2022, that required users to affirm: "I understand and agree that: . . . I have read the Node Applications Policy and the Terms of Service", and argue that "[r]eading a Terms of Service is not the same as agreeing to it." Doc. 24, p. 14. However, this argument fails as the specific phrase "I agree" is not required to bind parties to a contract. *See Register.com Inc. v. Verio, Inc.*, 356 F.3d 393 (2d. Cir. 2004). In *Register.com*, the Second Circuit held that "regardless of whether [a user] did or did not say, 'I agree' . . .[the user's] choice was either to accept the offer of the contract, taking the information subject to the terms of the offer, or, if the terms were not acceptable, to decline to take the benefits." *Id.* at 403; *see also Schnabel v. Trilegiant Corp.* 697 F.3d 110, 128 (2d Cir. 2012) ("[A]cceptance need not be express, but where it is not, there must be evidence that the offeree knew or should have known of the terms and understood that the acceptance of the benefit would be construed by the offeror as an agreement to be bound.").

Significantly, StrongBlock's TOS states: "If you do not agree to these Terms, you must cease your use of this site, and you may not use any of the Products & Services." Doc 17-3, ¶ 45. This phrase has appeared on all versions of the Terms of Service from January 16, 2021 onward.

9

*Id.* Later versions of the Terms of Service contain the following statements and likewise require StrongBlock website users to consent to the Terms of Service: "If you do not agree to these Terms, you must not access or use the Site."; "You agree and understand that by accessing or using the Site following any change to these Terms, you are agreeing to the revised Terms and all of the terms incorporated therein by reference."; "Review the Terms each time you access the Site to ensure that you understand how the Terms apply to your activities on the Site." *Id.* at 46.

There is clearly, at a minimum, constructive notice of the Terms of Service and the arbitration agreement contained therein. Due to the differing colors, clear hyperlink, and close proximity to the "Submit", "Approve," and "Create" buttons on the sign-up flows, StrongBlock users were undoubtedly on notice that the linked terms pertained to the action the user is about to take. *See Feld*, 442 F. Supp. 3d at 832. In fact, the NaaS sign-up flow takes it a step further than constructive notice, which is all that is required, by having users affirmatively acknowledge that they read the Terms of Service.

### E. The Parties' Arbitration Agreement Does Not Prevent "Effective Vindication" of Plaintiffs' Claims.

In a last-ditch effort to escape binding arbitration in this matter, Plaintiffs argue that the "effective vindication" exception to enforcement of arbitration agreements applies in this instance because the Complaint includes claims under the United States Security Act. *See.* Doc. 24, pp. 10-14. It bears mentioning, once again, that the Complaint fails to state a claim for relief under the Securities Act. *See* Doc. 17, p. 3, n. 2. StrongBlock offers Nodes-as-a-Service; it does not sell nodes (and certainly does not sell them in the United States). STRONG and STRNGR tokens are not sold on a United States-based centralized exchange, are not sold directly by StrongBlock to Plaintiffs on a decentralized exchange, nor are they exchanged as part of a "domestic transaction," which is required for application of the Securities Act. *See Morrison v. Nat'l Australia Bank Ltd.*,

561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010); *see also Williams v. Block one*, No. 20-CV-2809 (LAK), 2022 WL 5294189, at *9 (S.D.N.Y. Aug. 15, 2022*)* (rejecting class action settlement that included class members who exchanged cryptocurrency in foreign transactions and, thus, had "entirely non-meritorious claims" under the Securities Act).

Plaintiffs' Complaint is devoid of any allegations suggesting that United States Securities laws apply to these completely foreign cryptocurrency transactions. *See* Doc. 1. Plaintiffs cannot cure this deficiency by amending their pleading, as the necessary allegations as to domestic contacts cannot be made in good faith. Doc. 17-3, at ¶ 4 ("StrongBlock is an official tradename . . . of Jenison Holdings SEZC, a Special Economic Zone Company located in the Cayman Islands."); at ¶ 10 ("All StrongBlock nodes, infrastructure and applications are provisioned and exist on servers in Singapore."); at ¶ 15 ("All STRONG and STRNGR tokens were created on servers located in Singapore by individuals located in Germany. and the Cayman Islands"); at ¶ 19 ("The StrongBlock *nodes*, as opposed to the STRONG and STRNGR *tokens*, are not bought or sold on any type of exchange; StrongBlock maintains control and possession of the nodes, and the nodes physically remain in Singapore."). Simply stated: Plaintiffs do not have any rights under the United States Securities Act that require "vindication". More importantly, Plaintiffs cannot circumvent binding arbitration by including legally deficient Securities Act claims in their pleading.

However, even if Plaintiffs' Securities Acts claims are considered *arguendo*, Plaintiffs' rights could be fairly "vindicated" in the parties' chosen forum for arbitration. It is well established that statutory claims may be arbitrated "so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitrable forum." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000). Plaintiffs can effectively vindicate their claims through arbitration in a foreign venue. *See Pagaduan v. Carnival Corp.*, No. 15-CV-449 (CBA)

11

(LB), 2019 WL 13223715, at *7-8 (E.D.N.Y. Sept. 20, 2019), *aff'd,* 830 F. App'x 61 (2d Cir. 2020). First, foreign venues often have the ability to apply United States law, including U.S. Securities laws. *See Bancol Y CIA. S. En C. v. Bancolombia S.A.*, No. 99 CIV. 2216 (JSR), 2007 WL 640654 at *3 (S.D.N.Y. Mar. 1, 2007), *aff'd,* 280 F. App'x 85 (2d Cir. 2008) (allowing defendant to use expert testimony to show that Columbian courts can apply foreign law.) Second, a party does not rebut the presumption of enforceability of a foreign forum selection clause by showing "that the foreign law or procedure [is] merely . . . different or less favorable than" the law or procedure of the forum in which a plaintiff brings their claims. *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1363 (2d Cir. 1993); *see also Phillips v. Audio Active Ltd.*, 494 F.3d 378, 393 (2d Cir. 2007).

Plaintiffs' Opposition also relies on the conclusory declaration of Andrew Johnstone, an attorney in the Cayman Islands. *See* Doc. 24, at p. 11; *and* Doc. 25-4. Mr. Johnstone summarily concludes, without much analysis, that arbitrators in the Cayman Islands could not apply U.S. securities laws. Mr. Johnstone claims that the tribunal must apply Cayman Islands law to Plaintiffs' claims under the Securities Act because he says no statutory provision exists under Cayman Islands law. In response to Mr. Johnstone's declaration, Defendants respectfully submit the December 2, 2022 declaration of Mr. Hamid Khanbhai. *See* **Exhibit B;** *also Crowl*, Dkt. 39-2. Mr. Khanbhai identified the distinction between the choice of law provision for the arbitration agreement and the choice of law analysis for the parties' substantive claims. *Id.* at ¶¶ 37-38. Accordingly, he opined:

> If the substance of a dispute is a cause of action arising under the US Securities Laws and if . . . Cayman Islands law cannot apply because there are no identical provisions under Cayman Islands statute, then section 55(2) requires the tribunal to override that choice and, instead, to apply conflicts of law rules in order to determine what should be the law that applies to the substance of the dispute, notwithstanding the parties' express choice. For any cause of action that arises

12

>under a US statute, that will have the result that the relevant US law applies. . . . Any rights arising in relation to the US Securities Laws can therefore be vindicated one way or the other.

Defendants have presented compelling evidence that it is possible for arbitrators in the Cayman Islands to apply United States law to Plaintiffs' alleged claims under the U.S. Securities Act.

Plaintiffs, based on prior briefing in the related *Crowl* matter, anticipated that StrongBlock would rely on the expert testimony of Mr. Khanbhai and attempt to rebut this testimony in their Opposition brief. *See* Doc. 24, at pp. 16-18. Tellingly, however, Plaintiffs' legal arguments in response to Mr. Khanbhai's testimony *are not* supported by a supplemental declaration of their own Cayman law attorney, Mr. Johnstone. Meaning, Plaintiffs rely exclusively on Mr. Johnstone's November 14, 2022 Declaration, which does not rebut in any way Mr. Khanbhai's December 2, 2022 Declaration. Respectfully, we ask the Court to rely upon Mr. Khanbhai's analysis of Cayman Island law and not Plaintiffs' counsel, who are not admitted in the Cayman Islands and lack the qualifications to credibly criticize Mr. Khanbhai's reasoned analysis. Plaintiffs' "effective vindication" argument simply does not hold water.

**F.     StrongBlock Seeks a Dismissal of Plaintiffs' Claims or, in the Alternative, a Stay Pending Arbitration.**

Plaintiffs' final argument is much ado about nothing. Perhaps Plaintiffs see the writing on the wall as to pending dismissal and argue to the Court that an order compelling arbitration in the Cayman Islands is outside the Court's jurisdiction. Several district court judges in this District have declined to compel international arbitration and, instead, have simply dismissed or stayed the litigation pending the parties' arbitration proceedings. Notably, Plaintiffs concede that the Second Circuit has not ruled on this issue. Doc. 24, p. 15. Thus, the cases Plaintiff cites in support of their argument are not controlling on this Court. Plaintiffs' argument on this issue does not support a

denial of StrongBlock's Motion to Dismiss, or in the alternative, Motion to Stay. Indeed, all of the cases from this District cited by Plaintiffs involved the granting of the defendants' motion to dismiss or stay. *See, e.g.*, *L. Offs. of Joseph L. Manson III v. Keiko Aoki*, No. 19-CV-04392-LTS-GWG, 2020 WL 767466, at *4 (S.D.N.Y. Jan. 3, 2020) ("This case is hereby stayed pending the arbitration of Plaintiff's claims."); *J.P. Morgan Sec. Inc. v. Louisiana Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d 70 (S.D.N.Y. 2010) (denying motion for preliminary injunction to *prevent* arbitration); *Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*, 269 F. Supp. 2d 356 (S.D.N.Y. 2003) (granting motion to dismiss and awarding attorneys' fees against party who improperly pursued litigation instead of arbitration). Plaintiffs' claims are likewise subject to proper dismissal or a stay.

## CONCLUSION

The Court should not be persuaded by Plaintiffs' attempt to avoid dismissal by creating as much confusion as possible regarding StrongBlock sign-up flows. As demonstrated herein with verified evidence, StrongBlock's sign-up flows more than satisfy the notify and assent requirements set forth in *Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017). And while Plaintiffs' Complaint nominally includes claims under the U.S. Securities Act, Plaintiffs fail to allege facts necessary to show that these foreign transactions fall within the reach of the U.S. Securities Act. However, even if Plaintiffs could assert meritorious Securities Act claims, such claims could be "effectively vindicated" in the arbitration forum chosen by the parties. Dismissal or a stay of proceedings pending arbitration is just and appropriate under the circumstances.