UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONALD ABUDA, *et al.* <br><br>                     Plaintiffs, <br><br> -against- <br><br> STRONGBLOCK, DAVID MOSS, BRIAN ABRAMSON, COREY LEDERER, KONSTANTIN SHKUT, AND JOHN DOE DEFENDANTS 1-5, <br><br>                     Defendants. | 22-CV-10869-LTS-BCM |
| ERIK CROWL, *et al.* <br><br>                     Plaintiffs, <br><br> -against- <br><br> STRONGBLOCK, DAVID MOSS, BRIAN ABRAMSON, COREY LEDERER, KONSTANTIN SHKUT, AND JOHN DOE DEFENDANTS 1-5, <br><br>                     Defendants. | 22-CV-7313-LTS-BCM |

MEMORANDUM ORDER

       In these related actions, Donald Abuda and a combined total of 217 other individually named Plaintiffs assert virtually identical claims against "Strongblock," David Moss, Brian Abramson, Corey Lederer, Konstantin Shkut, and any unknown partners of "Strongblock, Inc." for alleged violations of Sections 5 and 12(a)(1) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c), 77l(a)(1), as well as claims based on breach of contract, fraud, unjust enrichment, and negligence theories.  Defendants have moved in each case to dismiss or stay the relevant complaint and compel arbitration pursuant to the Federal Arbitration Act

("FAA"), 9 U.S.C § 1 et seq.  (Docket entry no. 16 ("Notice of Motion to Dismiss and Compel Arbitration").)[1]  The Court has jurisdiction of these actions pursuant to 28 U.S.C. sections 1331 and 1367.

The Court has reviewed all of the parties' submissions carefully and, for the following reasons, finds that Plaintiffs have entered into binding agreements to submit their claims to arbitration, and denies the Defendants' motions insofar as they seek orders compelling arbitration but grants them to the extent they seek dismissal.


BACKGROUND

The following summary of facts is undisputed except where otherwise noted.  All facts are drawn from the allegations in the Complaints and the submissions proffered in connection with the instant motion practice.


Plaintiffs comprise 218 individuals who entered into agreements with "Strongblock" (also referred to in relevant documentation as "Strongblock, Inc."), through an internet site, concerning the creation and maintenance of S1 Nodes between January 16, 2021, and the day of the most recent complaint, December 23, 2022 (the "Relevant Period").  (See docket entry nos. 1 ("Compl.") ¶¶ 15-212, 24 ("Pl. Mem") at 3-4; Crowl, No-22-cv-7313, docket

---

[1]     Plaintiffs have also submitted a nearly identical motion in the related case also before this Court, Crowl v. Strongblock, No. 22-CV-7313-LTS-BCM (filed Aug. 26, 2022).  All parties have proffered acknowledgements regarding the related nature of these cases and the duplicative facts and legal issues within the instant motions.  (See docket entry no. 10 ("Statement of Relatedness").)  The Court will therefore address both pending motions with this single order.  Except where otherwise noted, all references to docket entries will refer to documents filed in Abuda v. Strongblock, No. 22-CV-10869-LTS-BCM (filed Dec. 23, 2022).

entry nos. 1 ("Crowl Compl.") ¶¶ 15-34, 30 ("Crowl Pl. Mem.") at 1.)  Strongblock provides a product called "S1 Nodes," which form part of the blockchain used for the storage and transfer of crypto-assets.  (Compl. ¶¶ 6-7.)  Strongblock sells crypto-tokens ("STRNG" and "STRNGR") that can be used to purchase Nodes as part of Strongblock's business model, Nodes-as-a-Service ("NaaS").  (Id. ¶¶ 252-53; docket entry no. 17-3 ("Moss Decl.") ¶ 6.)  Plaintiffs claim that they purchased the Nodes; Defendants characterize the transactions as types of agreements relating to Node services.  The distinction is not material to the issue of whether Plaintiffs' claims can be litigated in this court or are subject to the arbitration and venue provisions of the Terms of Service associated with the contracts for the Node transactions.

Plaintiffs allege that, from September 29, 2020, to April 2022, Strongblock marketed Nodes with the promise that Nodes would provide daily token rewards in perpetuity ("Node Universal Basic Income" or "NUBI").  (Compl. ¶¶ 1, 2, 12.)  Plaintiffs further allege that the individually named defendants participated in making these representations regarding the NUBI rewards system.  (Id. ¶ 286.)  In April 2022, Strongblock allegedly contradicted these representations by "arbitrarily and unilaterally" capping the cumulative rewards that could be generated by an individual Node without notice to customers.  (Id. ¶ 12.)  Plaintiffs assert that this change constituted a material alteration in the terms of their agreement with Strongblock. (Id. ¶ 12.)  Accordingly, Plaintiffs have filed this action asserting various breach of contract, conversion, and fraud claims, as well as claims that Strongblock violated the Securities Act through the unregistered sale of Nodes and claims against the individual defendants invoking a control person liability provision of the Securities Act.

In their motion papers, Defendants identify Jenison Holdings SEZC ("Jenison") as the entity that did business as "Strongblock," pointing to information on the Strongblock

website and in the contested Terms of Service that disclosed Jenison as the owner of the trade name Strongblock; Defendants deny that Strongblock is a separate legal entity. (Docket entry no. 17 ("Def. Mem.") at 2.) Plaintiffs contend that David Moss (identified by both parties as Strongblock's Chief Executive Officer), Brian Abramson, (identified as Strongblock's Chief Technical Officer), Corey Lederer (identified as Strongblock's Chief Product Officer), Konstantin Shkut (identified as Strongblock's Lead Developer), and unnamed John Doe partners (together, with Moss, Abramson, Lederer, and Skhut, "the Individual Defendants") comprised a general partnership doing business as Strongblock. (Pl. Mem. at 8-9.) The nature and particulars of the relationships among the defendant parties are not material to the controversy currently before the Court because all parties agree that the "Strongblock" internet Node transaction interface and the contested Terms of Service and arbitration agreement are the documents relevant to resolution of the motions before the Court. The Individual Defendants represent that they are not direct employees of Jenison Holdings SEZC but are employed by an (undisclosed) LLC that contracts with Strongblock for its employees. (Moss Decl. ¶ 3.) In the remainder of this Memorandum Order, the Court uses the term "Defendants" to refer to Jenison and the Individual Defendants. All references to "Strongblock" signify generic references to the business entity operating the Node business and website.

Defendants now move to dismiss the Complaint and compel arbitration of all claims according to the Terms of Service that, they assert, Plaintiffs agreed to when creating their Nodes. (See Notice of Motion to Dismiss and Compel Arbitration.) To create their Nodes, each Plaintiff was required to register by visiting Strongblock's website, connecting their electronic cryptocurrency wallet, and choosing to "Create Node." (Pl. Mem. at 2.) At all times during the Relevant Period, Plaintiffs had to click a box on this sign-up page signifying, inter

<u>alia</u>, that they "understand and agree that" they have either "read . . . the Terms of Service" or "agree with the . . . Terms of Service." (Moss Decl. ¶¶ 29-39.) The Terms of Service were hyperlinked on that sign up page. (<u>Id.</u>) Additionally, at all times during the Relevant Period, the hyperlinked Terms of Service document included an Agreement to Arbitrate, which provided in relevant part that:

> YOU AND StrongBlock AGREE THAT ANY DISPUTE, CLAIM, OR CONTROVERSY BETWEEN YOU AND StrongBlock ARISING IN CONNECTION WITH OR RELATING IN ANY WAY TO THESE TERMS OR TO YOUR RELATIONSHIP WITH StrongBlock AS A USER OF THE SERVICE . . . WILL BE DETERMINED BY MANDATORY BINDING INDIVIDUAL . . . ARBITRATION.

(Docket entry no. 17-6 (the "Terms of Service" or "TOS") at 3-4.) The Arbitration Agreement also contained a forum-selection clause stating, "Absent a contrary decision of the arbitrator or otherwise required by applicable law, the parties agree that the seat and venue of the arbitration is the Cayman Islands." (<u>Id.</u>) A separate section of the TOS titled, "Applicable Law; Jurisdiction," contained a provision stating,

> These Terms and all Disputes . . . are governed by and will be construed and enforced in accordance with the internal laws of the Cayman Islands without regard to choice-of-law rules. 'Dispute' is a controversy, disagreement, or claim between the parties with respect to, arising out of, or relating to these Terms in any manner whatsoever, whether in contract or tort, or whether legal or equitable."

(<u>Id.</u> at 6.)

<u>DISCUSSION</u>

The FAA provides that arbitration agreements in contracts involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity

for the revocation of any contract." 9 U.S.C.A. § 2 (Westlaw current through P.L.118-13).[2]  The

Court is required to "direct[] the parties to proceed to arbitration in accordance with the terms of

the [arbitration] agreement," provided that there is no issue regarding its formation or validity.  9

U.S.C.A. § 4 (Westlaw current though P.L.118-13); Alfonso v. Maggies Paratransit Corp., 203 F.

Supp. 3d 244, 246 (E.D.N.Y. 2016).  "'In the context of motions to compel arbitration brought

under the [FAA] . . . the court applies a standard similar to that applicable for a motion for

summary judgment,' and courts may therefore consider materials outside the complaint,

including the arbitration agreement itself."  Id. at 247 (quoting Bensadoun v. Jobe-Riat, 316 F.3d

171, 175 (2d Cir. 2003)).  A motion to compel arbitration may be granted "when the pleadings,

the discovery and disclosure materials on file, and any affidavits show that there is no genuine

issue as to any material fact and that the movant is entitled to judgment [compelling arbitration]

as a matter of law."  Cohen v. UBS Fin. Servs., Inc., No. 12-CV-2147-BSJ, 2012 WL 6041634,

at *1 (S.D.N.Y. Dec. 4, 2012) (internal quotation marks and citations omitted).

To address Defendant's motion to compel arbitration, the Court begins by

determining "whether the parties agreed to arbitrate disputes at all."  ACE Cap. Re Overseas Ltd.

v. Cent. United Life Ins. Co., 307 F.3d 24, 28 (2d Cir. 2002).  "'[W]hen deciding whether the

parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should

apply ordinary state-law principles that govern the formation of contracts.'"  Bell v. Cendant

Corp., 293 F.3d 563, 566 (2d Cir. 2002) (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S.

938, 944 (1995)).  "A party seeking to compel arbitration bears the burden of showing that the

---

[2]      Plaintiffs do not dispute that the Arbitration Agreement is a contract involving interstate
commerce.  See 9 U.S.C. § 2 ("[A] contract evidencing a transaction involving commerce
to settle by arbitration a controversy thereafter arising out of such contract . . . shall be
valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity
for the revocation of any contract or as otherwise provided in chapter 4.").

arbitration agreement exists and a stay is warranted."  Savarese v. J.P. Morgan Chase, 2016 WL 7167968, at *3 (E.D.N.Y. 2016) (internal quotation marks and citations omitted).  "This burden may be satisfied by the actual production of the arbitration agreement . . . [then] the burden of proof shifts to the plaintiff to show a 'substantial issue' concerning the presence of an agreement to arbitrate."  Roller v. Centronics Corp., No. 87-CV-5715-JFK, 1989 WL 71200, at *2 (S.D.N.Y. 1989) (citing Almacenes Fernandez, S.A. v. Golodetz, 148 F.2d 625, 628 (2d Cir. 1945)).

Under New York law, "a party who executes a contract is considered bound by the terms of that contract."  Ruiz v. New Avon LLC, No. 18-CV-9033-VSB, 2019 WL 4601847, at *6 (S.D.N.Y. Sept. 22, 2019) (quoting Stern v. Espeed, Inc., No. 06-CV-958-PKC, 2006 WL 2741635, at *1 (S.D.N.Y. Sept. 22, 2006)).  Furthermore, if the Court finds that the parties executed a valid contract, "[a] party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid."  Harrington v. Atl. Sounding Co., 602 F.3d 113, 124 (2d Cir. 2010).

Agreement to Arbitrate

To rule on a petition to compel arbitration, the Court must decide two main issues: "(1) whether the parties agreed to arbitrate, and (2) if so, whether the scope of the agreement encompasses the claims at issue."  Cornelius v. Wells Fargo Bank, N.A., No. 19-CV-11043-LJL, 2020 WL 1809324, at *3 (S.D.N.Y. Apr. 8, 2020) (citing Holick v. Cellular Sales of N.Y., LLC, 802 F.3d 391, 394 (2d Cir. 2015)).  Here, the parties do not dispute that the Plaintiffs' claims fall within the scope of the Agreement to Arbitrate within the TOS for the Relevant Time Period.  Therefore, the Court need only determine whether the Plaintiffs entered

into a valid Arbitration Agreement when each of them accessed Strongblock's website and created their Nodes.

It is undisputed that, as part of the process of Creating a Node, each Plaintiff checked a box signifying that they "read and agreed," "have read . . . the Terms of Service," or "have read and agreed to . . . the Terms of Service," and that the words "Terms of Service" were in a different color from the rest of the text and were hyperlinked to the full TOS.  (See Moss Decl. ¶¶ 29-39.)  It is also undisputed that the TOS contained a sufficiently conspicuous Arbitration Agreement.  (See Terms of Service at 4.)  Plaintiffs assert, however, that they did not manifest assent to the Arbitration Agreement because the portion of the sign-up page relating to the TOS was not sufficiently "reasonably conspicuous" to put Plaintiffs on notice that they were agreeing to the content of the TOS.  (Pl. Mem. at 6.)

To determine whether Plaintiffs were on notice of the web-based contract, "we look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put [them] on inquiry notice of such terms."  Starke v. SquareTrade, Inc., 913 F.3d 279, 289 (2d Cir. 2019).  Reviewing the features of the Strongblock Node creation sign-up page holistically, the Court finds all relevant iterations of the page gave customers sufficiently conspicuous notice of the contract terms.

Plaintiffs first argue that the page gave deficient notice because the hyperlink to the TOS was not sufficiently obvious, particularly in later dark-mode versions of the sign-up page where the light blue link was set against a dark blue background and the surrounding text was white.  (Pl. Mem. at 7-8; see also Moss Decl. ¶¶ 33-38.)  This argument is unpersuasive and

inconsistent with binding authority.[3]  The sign-up page featured a checkbox requiring customers to signify their agreement to a relatively short, uncluttered, bulleted list with the TOS hyperlinked and set apart in unique colored font.  (Moss. Decl. ¶¶ 33-38.)  The sign-up page explicitly prompted customers to read and agree to the TOS, putting customers unambiguously on notice that they were agreeing to certain terms.  Cf. Starke, 913 F.3d at 289 (finding no notice where the sign-up email did not prompt customers to click the link for the TOS and did not advise customers that they were agreeing to contract terms in that document).  The page also contained clear text that was entirely visible on one screen, presented in a consistent font, and formatted with no distracting graphics.  Cf. Nicosia v. Amazon.com, Inc., 834 F.3d 220, 236-37 (2d Cir. 2016) (finding that a sign-up page gave insufficient notice where it contained cluttered information including "between fifteen and twenty-five links," "text . . . displayed in at least four font sizes and six colors," and "multiple buttons and promotional advertisements").  The design of the sign-up page as a whole satisfies the Court that customers had sufficiently conspicuous notice of the contract terms when they created their Nodes.

Plaintiffs' additional arguments that notice was defective because (1) the interface did not require customers to scroll through the TOS before affirming their agreement, and (2) the interface did not require a separate checkbox solely to signify agreement to the TOS, are similarly unavailing.  There is no legal requirement that customers scroll through the contract before signifying their agreement.  Meyer v. Uber Techs., Inc., 868 F.3d 66, 80 (2d Cir. 2017).  Nor is there any requirement that a separate checkbox signifying the customer's separate agreement to the TOS term of the sign-up page be provided.  Id. at 80 (finding valid a sign-up

---

[3]    Both parties rely on New York and Second Circuit authority in their argumentation as to whether the Agreement was binding and sufficiently conspicuous, and the Court does the same.

flow similar to Strongblock's, where customers had to click a hyperlink to see the TOS, were not required to scroll through it to agree, and users were not required to click a button saying "I agree" to the TOS).

Finally, Plaintiffs assert that, even if the sign-up flow was generally sufficient, one iteration of the sign-up flow, used from May 19, 2022, to June 22, 2022, gave defective notice because it required customers to indicate that "I have *read*" the Terms of Service, rather than "I agree" to the Terms of Service.  (See Moss. Decl. ¶ 35 (emphasis added).)  The Court finds the variance in the terminology of this particular sign-up flow insufficient to invalidate the contract.  The Second Circuit has held that "[a contract's] acceptance need not be express" if there is evidence "that the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound." Schnabel v. Trilegiant Corp., 697 F.3d 110, 128 (2d Cir. 2012).  Here, the Terms of Service themselves stated clearly that, "[i]f you do not agree to these Terms, you must cease your use of this site, and you may not use any of the Products & Services."  (See docket entry no. 17-6 at 1.) Therefore, a customer's representation that he or she read the TOS, coupled with use of the Nodes-as-a-Service product, was sufficient to create a binding contract.  See also Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004) (finding that user did not need to say "I agree" explicitly to create a binding contract because the choice was either to accept the offer of the contract, or to decline to take the benefits).

For the foregoing reasons, the Court finds that the Arbitration Agreement created a binding obligation that Plaintiffs arbitrate their claims individually against Defendants in the chosen forum.  This obligation applies with equal force to any claims brought against the Individual Defendants, who are entitled to the protection of the Agreement as disclosed agents of

the entity Strongblock (or, if Plaintiffs' theory of the nature of the Strongblock entity is correct, as general partners of Strongblock).[4]  Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1360 (2d Cir. 1993); see also McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co., No. 14-CV-6633-KBF, 2015 WL 144190, at *7 (S.D.N.Y. Jan. 12, 2015) (finding that corporate agents are "protected by" an Arbitration Agreement "to the extent they are charged with misconduct within the scope of the agreement").

Effective Vindication Exception

Because the Court finds that the parties created a valid contract, Plaintiffs now bear the burden of showing that the agreement is inapplicable or invalid with respect to their claims.  Harrington, 602 F.3d at 124.  Plaintiffs argue that the Agreement is unenforceable because arbitration in the Cayman Islands according to the terms of the Agreement would prevent the effective vindication of their claims arising under the Securities Act.  (Pl. Mem. at 10.)  The effective vindication doctrine directs courts to invalidate on public policy grounds agreements that operate "as a prospective waiver of a party's right to pursue statutory remedies[.]"  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 n. 19 (1985).  The mere fact that the Agreement requires arbitration in a foreign jurisdiction is insufficient to establish that Plaintiffs' Securities Act claims could not be vindicated effectively; courts have held that international arbitrators can apply and effectively vindicate claims under the Securities Act.  Bacol Y CIA. S. En C. v. Bancolombia S.A., No. 99-CV-2216-JSR, 2007 WL 640654, at *3 (S.D.N.Y. 2007), aff'd 280 F. App'x 85 (2d Cir. 2008); Scherk v. Alberto-

---

[4]     Plaintiffs do not dispute that the Arbitration Agreement, if found valid, applies to the Individual Defendants.

Culver Co., 417 U.S. 506 (1974).  Plaintiffs argue, however, that the choice-of-law provision in

the Agreement precludes the application of the Securities Act to govern the substance of

Plaintiffs' statutory claims.

        The forum-selection clause of the Arbitration Agreement requires arbitration in

the Cayman Islands.  (Terms of Service at 4.)  The TOS further provide that, "These Terms and

all Disputes . . . are governed by and will be construed and enforced in accordance with the

internal laws of the Cayman Islands without regard to choice-of-law rules."  (Id. at 7.)  The TOS

define "Disputes" as "a controversy, disagreement or claim between the parties with respect to,

arising out of, or relating to these Terms in any manner whatsoever, whether in contract or tort,

or whether legal or equitable."  (Id.)  Plaintiffs interpret the choice of law and "Disputes"

provisions as requiring that the substance of all claims submitted to arbitration be decided solely

under internal Cayman Islands law and, based on that interpretation, have proffered an opinion

by Andrew Johnstone, a lawyer licensed to practice in the Cayman Islands, that the Cayman

Islands have no substantively equivalent law to the Securities Act, and that Plaintiffs' Securities

Act claims cannot be effectively vindicated through arbitration pursuant to the Agreement.

(Docket entry no. 25-4 ("Johnstone Decl.") at ¶¶ 11, 22, 23; see also Fed. R. Civ. P. 44.1 ("In

determining foreign law, the court may consider any relevant material or source, including

testimony . . . .").)

        Plaintiffs' argument is unavailing for two reasons.  First, it is not clear from the

language of the TOS that the "applicable law" provision designates Cayman Islands law as the

exclusive governing law for the substance of all disputes, rather than simply as the law governing

the interpretation of the agreement.  Defendants have tendered the declaration of Hamid

Khanbhai, another licensed Cayman Islands attorney, who opines that the contract terms show

that "the parties have not chosen what law applies to the substance of a dispute arising under a foreign statute, such as the US Securities Law." (Docket entry no. 32-5 ("Khanbhai Decl.") ¶ 18.) Mr. Khanbhai proffers that, under Cayman Islands law, the choice-of-law provision would be interpreted as applying only to the "applicable law of the arbitration agreement," which encompasses question of validity, enforceability and interpretation of the arbitration agreement, and not to the substance of the underlying claims, thereby leaving unconstrained the arbitrator's ability to apply foreign law, such as the Securities Act of 1933, under which a party has asserted claims. (Id. ¶¶ 28, 29.)

Mr. Khanbhai also opines that, even, if the Agreement were read to specify Cayman Islands law as governing the substance of Plaintiffs' claims, Cayman Islands law would require arbitrators to override the contractual choice-of-law provision and apply U.S. securities law to the relevant claims. Mr. Khanbhai cites Section 55 of the Cayman Arbitration Act as providing a mandatory choice-of-law rule that overrides any contractual provisions whenever "the law chosen cannot apply to the substance of the dispute." (Id. ¶¶ 30-32.) Mr. Khanbai persuasively parses the provisions of the statute to demonstrate that it would require arbitrators to apply conflict of laws rules to determine the law applicable to the substance of the Plaintiffs' claims, making the application of the Securities Act a viable possibility in that forum. (Id. ¶ 32.) Plaintiffs' affiant, Mr. Johnstone, merely assumes that the TOS choice of law provision exclusively requires resort to internal Cayman Islands law, does not provide a rebuttal to Mr. Khanbhai's analysis of the TOS or of Cayman Islands law, and does not address Section 55 at all. (See Johnstone Decl.) Although Plaintiffs' attorneys of record argue that Mr. Khanbhai's analysis of Section 55 is "speculative," they do not provide a contrary analysis from anyone

licensed to practice in the Cayman Islands, and thus fail to carry their burden of persuasion on this issue.  (Pl. Mem. at 14.)

Therefore, the Court finds that Plaintiffs have not demonstrated that their claims under the Securities Act cannot be vindicated effectively in the chosen arbitral forum.

Jurisdiction to Compel Arbitration

Although the Second Circuit has not decided the question of whether Section 4 of the FAA precludes a district court from compelling arbitration outside of its district, persuasive lower court decisions in this Circuit have routinely held that it does.  See, e.g., AKS Trade Co., LLC v. Americap Direct Corp., No. 21-CV-9364-KPF, 2022 WL 1184203, at *4 n. 8 (S.D.N.Y. Apr. 21, 2022) (adopting "the majority view in finding that [the Court] lacks the power to compel the parties to arbitrate in a different jurisdiction"); Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc., 269 F. Supp. 2d 356, 363-64 (S.D.N.Y. 2003) ("[T]he Court's authority to compel arbitration under FAA § 4 is restricted to arbitration proceedings that occur within this District."); DaPuzzo v. Globalvest Mgmt. Co., L.P., 263 F. Supp. 2d 714, 727 (S.D.N.Y. 2003) ("[A] district court compelling arbitration under § 4 lacks the power to order arbitration to proceed outside its district." (quoting Jain v. de Mere, 51 F.3d 686, 690 (7th Cir. 1995))); Provident Bank v. Kabas, 141 F. Supp. 2d 310, 315 (E.D.N.Y. 2001) ("[A]rbitration may be ordered to proceed only within the judicial district in which the petition to compel has been filed.").  The Arbitration Agreement provides that "the seat and venue of the arbitration is the Cayman Islands."  (Terms of Service at 4.)  The Court concludes that it cannot compel arbitration in the Cayman Islands and, thus, cannot grant Defendant's motion to the extent it seeks an order compelling the arbitration of Plaintiffs' claims.  Instead, the Court grants the

Defendants' alternative request to dismiss Plaintiffs' claims without prejudice to arbitration in the chosen forum.  See Rost v. Lib. Coca-Cola Beverages, LLC, No. 20-CV-10559-VB, 2021 WL 3723092, at *5 (S.D.N.Y. Aug. 23, 2021) ("When, as here, a defendant requests that an action be dismissed and requests a stay in the alternative, the Court 'has discretion in determining whether to stay or dismiss the case pending arbitration.'" (quoting Worthington v. JetSmarter, Inc., No. 18-CV-12113-KPF, 2019 WL 4933635, at *8 (S.D.N.Y. Oct. 7, 2019))).

<u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that the arbitration provision of the Strongblock Node Terms of Service requires Plaintiffs to arbitrate the claims raised in this action on an individual basis in the Cayman Islands.  Defendants' motions to compel arbitration are denied, and Defendants' motions for dismissal are granted without prejudice to litigation of Plaintiffs' claims in the arbitral forum.  The Clerk of Court is respectfully directed to enter judgment accordingly and to close both of the above-captioned cases.  This Memorandum Order resolves Docket Entry No. 16 in <u>Abuda v. Strongblock</u>, No. 22-CV-10869-LTS-BCM (filed Dec. 23, 2022); and Docket Entry No. 23 in <u>Crowl v. Strongblock</u>, No. 22-CV-7313-LTS-BCM (filed Aug. 26, 2022).


SO ORDERED.

Dated: New York, New York
        September 27, 2023


    /s/ Laura Taylor Swain
    LAURA TAYLOR SWAIN
    United States District Judge